**LINBECK CONSTRUCTION CORPORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 75–3555.

United States Court of Appeals, Fifth Circuit.

April 11, 1977.

Hugh E. Hackney, A. Martin Wickliff, Jr., Oscar N. Hibler, Jr., Houston, Tex., for petitioner.

Elliott Moore, Deputy Associate Gen. Counsel, David A. Fleischer, Atty., N.L. R.B., Washington, D.C., for respondent.

Before MORGAN and GEE, Circuit Judges, and HUNTER,* District Judge.

LEWIS R. MORGAN, Circuit Judge:

Linbeck Construction Company [Linbeck] petitions for review of an order of the National Labor Relations Board issued on August 5, 1975, 219 N.L.R.B. No. 133. That order concerns two segments of picketing during the summer of 1974 that Linbeck alleges to have violated Section 8(b)(4)(i)(ii)(B) of the National Labor Relations Act.[1]

I. *Facts.*

Linbeck was the general contractor for the construction of a shopping mall in Austin, Texas. The excavation, paving, sani-

---

* Senior District Judge of the Western District of Louisiana, sitting by designation.

1. Section 8(b)(4)(i)(ii)(B) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4)(i)(ii)(B) reads as follows:

    (b) It shall be an unfair labor practice for a labor organization or its agents—

    . . . . .

    (4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

    . . . . .

    (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.

tary, and storm sewer work was subcontracted to Luckie Construction Company [Luckie], a non-union employer. Shortly after construction began in June of 1973, Linbeck barricaded all entrances to the project except an entrance on Northcross Drive designated for the use of Luckie's employees and suppliers [Luckie gate] and an entrance on Anderson Lane [Linbeck gate] reserved for the employees and suppliers of Linbeck and the other subcontractors.[2] Despite the restrictions indicated on the gate signs, Luckie's employees and suppliers continued to enter the job site through the Linbeck gate.

On June 20, 1974, upon hearing rumors that the International Union of Operating Engineers, Local Union No. 450, AFL–CIO [Union] intended to picket the job site to protest Luckie's non-union hiring practices, Linbeck's project manager sent the Union a telegram stating that Linbeck had designated the Northcross gate for the use of Luckie, its employees, materials and equipment; other employers, their suppliers, and employees would use the Linbeck gate. On June 24, the Union set up two pickets: one at the Luckie gate and one who walked 100–150 feet on Anderson Lane, but who never came closer than 100 feet to the Linbeck gate. Picketing continued in this fashion through June 26. While Luckie employees used only the Luckie gate to enter the site during this period, materials to be used by Luckie, such as cement, steel, and crushed stone, were delivered through the Linbeck gate and were signed for by Linbeck employees. Prior to the picketing, such materials had been received by Luckie employees.

On June 26, Linbeck's project manager sent the Union a telegram indicating that henceforth Luckie would cease working on the job site between 7:30 a. m. and 4:30 p. m. on weekdays, instead working between 5:00 p. m. and 7:00 a. m. on weekdays and twenty-four hours a day on weekends; upon receipt of the telegram, the Union removed its pickets. Linbeck subsequently sent the Union a letter informing it that Luckie would not resume work until July 19. Thereafter, Luckie did not return to the site until July 20 and the Union did not resume picketing until July 24.[3] Upon resuming work on July 20, Luckie's employees, who entered the job site each evening through the Luckie gate, adhered to their announced schedule and were not on the job site during the weekdays. Materials that Luckie worked on in the evenings, however, were delivered during the day at the Linbeck gate and received by the general contractor's employees. In addition, Luckie and his foreman, Joe Jackson, visited the job site on two occasions during the day to examine the materials that had been delivered and to make preparations for their crew's work that evening.

On the evening of July 24, when Luckie employees were working on the job site, the Union, displaying the same picket signs as those used in June, resumed its picket of the Luckie gate.[4] The pickets returned during the day on July 25 and July 26 to the Luckie gate and, in response to the barricaded gate and covered gate sign,[5] covered their own sign, which indicated the object of their grievance. On July 29, 30, and 31,[6] picketing again occurred at the Luckie gate, this time with the picket sign

2. The Luckie and Linbeck gates were approximately one-half mile from each other.

3. The Union did picket on July 1 when it mistakenly thought that Luckie was present on the site, but the Administrative Law Judge and Board held this picketing violated 8(b)(4)(i) and (ii)(B) of the Act. The Union has not appealed this finding and it is not in issue here.

4. Luckie does not assert any illegality in this picketing since it was scheduled to be, and was in fact, on the site on the evening of July 24.

5. During weekdays, when Luckie was not working at the site, Linbeck barricaded and covered the gate and sign, respectively. It uncovered and opened the gate for entry during those times—weeknights and weekends—that Luckie was scheduled to work.

6. Picketing also occurred on Saturday and Sunday, July 27 and 28, but since Luckie was scheduled to work on these days, Linbeck does not contend that this picketing was unlawful.

uncovered, but on August 1 the picket again covered his sign. On August 2, he picketed for a couple of hours with an uncovered sign before leaving. No picketing, with a covered or uncovered sign, has occurred since that time.

## II. *Findings by Administrative Law Judge and Board.*

The Administrative Law Judge concluded that the June 24–26 picketing at Anderson Lane,[7] 100 feet from the Linbeck gate, did not constitute a violation of § 8(b)(4)(i)(ii)B, but that the July 25–26 and July 29–August 2 picketing did violate the National Labor Relations Act's prohibitions against secondary activity. Upon review of the judge's findings, the Board held that neither segment of picketing violated the Act. The Administrative Law Judge concluded that the June picketing was legal primarily on the ground that a telegram, alone, could not convert a previously integrated job into a job separated by reserve gates and that, therefore, the Union could, pursuant to *Sailors Union of the Pacific [Moore Dry Dock]*, 92 N.L.R.B. 547 (1950), validly picket anywhere on the site. The Board agreed with the judge's conclusion, but disagreed with his reasoning. Arguing that a telegram would be sufficient to establish a valid reserve gate situation if the gates themselves were legitimately maintained, the Board held that the delivery of materials for Luckie's use through the Linbeck gate violated the integrity of the gates and, thereby, made permissible the picketing on Anderson Lane.

Regarding the July 25–August 2 picketing, the judge rejected Linbeck's contention that its ownership of the materials that Luckie was to work on insulated delivery of those materials from the Union's primary picketing of Luckie. Yet, while the Union could picket when deliveries of materials for Luckie's use were being made or when Luckie and his supervisor visited the site during the day, the judge concluded that because the Union picketed at times during the day when deliveries and visits by Luckie were not being made, this additional picketing constituted unlawful secondary activity.

The Board agreed that Linbeck and Luckie had violated their reserved time schedules by the delivery during the day of materials to be used by Luckie at night and by the visits of Luckie and his supervisor to the site during the day. It held, however, that to limit the Union's picketing to only those times when the above two incidents occurred would place the Union in an impossible situation in that it could never know in advance when deliveries or visits would be made so that it could organize a picket at only those times. Accordingly, since Luckie had misled the Union and violated its reserved time schedule, the Union was free to picket the site during the day, subject only to the guidelines articulated in *Moore Dry Dock*, 92 N.L.R.B. 547, 549 (1950). The Board acknowledged that the Union had violated one of *Moore's* requirements—that the picketing clearly disclose that the dispute is only with the primary employer—through the shrouding of its picket sign on four days. Yet, because the facts of the case indicated that the Union was not attempting to enmesh neutrals in its dispute with the primary employer through the covering of its sign and because a long line of Board decisions hold that *Moore* is not to be applied mechanically, the Board found that this act did not render the picketing impermissible secondary activity.

## III. *Discussion*

### A. *Ownership of Materials Vital to Primary Employer's Operations.*

Section 8(b)(4) of the National Labor Relations Act seeks to carry out the "dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes . . . [while] shielding unoffending employers and others

---

7. Union officials testified that they picketed at a particular spot on Anderson Lane at which they believed Luckie to be working.

from pressures in controversies not their own." *N.L.R.B. v. Denver Building and Construction Trades Council*, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951). The common situs situation, in which primary and neutral employers work at the same site, has required the Board and reviewing courts to draw lines "more nice than obvious," *Electrical Workers (IUE), Local 761 v. N.L.R.B. (General Electric)*, 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961), in determining when primary conduct ends and impermissible secondary activity begins. In *Moore Dry Dock, supra*, the Board articulated four guidelines that have served as the standard by which the legality of common situs picketing has been gauged. Thus, to be classified as primary activity, the picketing must meet the following conditions: (a) the picketing is strictly limited to times when the *situs* of the dispute is located on the secondary employer's premises; (b) at the time of the picketing the primary employer is engaged in its normal business at the *situs*; (c) the picketing is limited to places reasonably close to the location of the *situs*; and (d) the picketing discloses clearly that the dispute is with the primary employer. 92 N.L.R.B. at 549. The Supreme Court has authorized employers at a common situs to set up separate gates through which the primary employees and secondary employees may enter. *General Electric*, 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592. By maintaining a separate gate for access to the site, the employees, suppliers, and deliverymen of neutral employers operating at a common situs, thus, can be insulated from disputes involving other employers at the site, in that pickets can operate only at the gate of the employer with whom they have a grievance. In *General Electric*, however, the Supreme Court qualified the reserve gate doctrine by requiring that the work done by the "neutral" employers who maintain the separate gate be unrelated to the normal operations of the employer who is being picketed. *General Electric*, 366 U.S. at 681, 81 S.Ct. 1285. Relying on *Denver Building Trades*, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951), however, this court has enforced a

Board decision holding that the "relatedness" test established in *General Electric* does not apply to employers at a common construction situs, *Building and Construction Trades Council of New Orleans (Markwell & Hartz)*, 155 N.L.R.B. 319 (1965), enforced *Markwell & Hartz, Inc. v. N.L.R.B.*, 387 F.2d 79 (5th Cir. 1967), *cert. denied*, 391 U.S. 914, 88 S.Ct. 1808, 20 L.Ed.2d 653 (1968). That is, whether or not the work of the various sub-contractors is "related" to that of the general contractor or to that of each other is not relevant in determining the validity of the separate gates. Thus, on construction sites occupied by two or more employers, *Moore Dry Dock* tests, alone, will be applied to allegedly secondary picketing so that picketing at the gate reserved for a neutral employer generally will contravene the third *Moore* guideline—that picketing be limited to places reasonably close to the location of the situs—and will result in a finding of secondary activity in violation of § 8(b)(4) of the Act.

Linbeck argues that at the time of the June picketing it had set up reserve gates in accordance with *Markwell & Hartz* and that while the Union could properly picket at the Luckie gate, since its dispute lay with Luckie, its picketing on Anderson Lane, one hundred feet from the gate set up for Linbeck, with whom it had no dispute, was not reasonably close to the situs of the dispute and constituted a violation of the *Moore Dry Dock* guidelines. The Board argues that delivery at the Linbeck gate of crushed stone to be worked on by Luckie violated the integrity of the neutral's gate and destroyed its immunity from primary picketing against Luckie, thereby rendering lawful the pickets one hundred feet away on Anderson Lane. Linbeck rebuts that because it was the legal owner of the crushed stone at the time of its delivery, the supplier of the stone was not a supplier of Luckie and was not a proper object of primary picketing.

■ Suppliers, deliverymen, and materialmen of primary employers occupy a middle ground in the spectrum of permissible activity under 8(b)(4). They are neutral

employees to the extent that direct appeals to them with an object to induce them not to deliver to or deal with the primary employer will result in a finding of unlawful secondary activity. *See, e. g., Nassau Building Trades Council (Theresa Garden Apartments, Inc.),* 162 N.L.R.B. No. 13, 64 L.R.R.M. 1035 (1966) (unlawful secondary activity when picketers asked supplier not to deliver material to primary employer); *Teamsters, Local 408 (Charles S. Wood & Co.),* 132 N.L.R.B. No. 10, 48 L.R.R.M. 1326 ( ) (unlawful secondary activity when picketers requested deliveryman to respect their picket line). Yet, their activities are sufficiently vital [8] to the daily operations of the primary employer that the latter cannot insulate them from the influence of a valid primary picket itself.[9] Thus, in *General Electric,* the Supreme Court held that while a primary employer on a common situs could establish separate gates for the use of employees of neutral employers, he could not set up a separate gate for those making regular plant deliveries since "the barring of picketing at that location would make a clear invasion on traditional primary activity of appealing to neutral employees whose tasks aid the employer's everyday operations. 366 U.S. at 680–81, 81 S.Ct. 1285. Likewise, in *United Steelworkers of America v. N.L.R.B. [Carrier Corporation],* 376 U.S. 492, 84 S.Ct. 899, 11 L.Ed.2d 863 (1964), the Supreme Court held to be primary that picketing of a gate that was used by neutral employees who made deliveries and pick-ups of goods at the primary's plant, but that was not on the primary's property and was not used by the primary's employees for access to the premises:

> The primary strike, which is protected by the proviso, is aimed at applying economic pressure by halting the day-to-day operations of the struck employer. But Congress not only preserved the right to strike; it also saved 'primary picketing'

from the secondary ban. Picketing has traditionally been a major weapon to implement the goals of a strike and *has characteristically been aimed at all those approaching the situs whose mission is selling, delivering, or otherwise contributing to the operations which the strike is endeavoring to halt. In light of this traditional goal of primary pressures we think Congress intended to preserve the right to picket during a strike a gate reserved for employees of neutral delivery men furnishing day-to-day service essential to the plant's regular operations.* 376 U.S. at 499, 84 S.Ct. at 904 (emphasis added). Several Board decisions, holding that failure of gate signs to indicate that suppliers of the primary must use the primary's gate alone removes the secondary gates from the protection from picketing normally accorded them, reveal the importance of the right to direct pickets toward gates used by these suppliers. *See Building & Construction Trades Council [Daniels Construction Co.],* 192 N.L.R.B. No. 53; 77 L.R.R.M. 1830 (1971); *IBEW Local 441 (Jones & Jones, Inc.),* 153 N.L.R.B. No. 57, 62 L.R.R.M. 1074 (1966); *Plumbers & Pipefitters Union (Center Plumbing & Heating Corp.),* 145 N.L.R.B. No. 21, 54 L.R.R.M. 1341 (1963).

■■ Clearly, then, Luckie could not insulate its suppliers from picketing by setting up a separate gate; likewise, if Luckie suppliers were using a neutral's gate, the mixed use of that gate would render it a proper object of picketing against Luckie. *General Electric,* 366 U.S. at 682, 81 S.Ct. 1285. The question in this case is whether legal ownership by a neutral employer of the materials to be used by the primary employer in its normal course of business removes the delivery of these materials from its traditional role as an activity subject to picketing by those who so demon-

---

8. While *Markwell and Hartz* deletes application of a "relatedness" test to the several employers on a common construction site, in view of the unusual characteristics of that industry, no one has suggested, or argued here, that it relieves the supplier of a particular construction employer from traditional primary picketing.

9. A proviso to 8(b)(4) states that "nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing." 29 U.S.C. § 158(b)(4)(B).

strate against the primary employer. We agree with the Administrative Law Judge and the Board that the controlling question is not who has title to the goods, but is for whose use are they intended. Thus, any gate used to deliver materials essential to the primary employer's normal operations is subject to lawful picketing. If we were to adopt Linbeck's reasoning, general contractors throughout the construction industry could stop a "traditional goal of primary pressure"—halting the operations of the primary employer through the influence of a picket line on those suppliers who contribute thereto—by the simple expedient of retaining legal title to all materials to be used by the sub-contractors. Indeed, we note that while the Administrative Law Judge's findings indicate that Linbeck was the owner of the crushed stone before and after the June 24th picketing, Linbeck concedes [10] that prior to June 20, 1974, when Linbeck heard rumors of a picket, some of the material used by Luckie had been owned by Luckie; the "change" [11] in ownership arose four days prior to the initial June picketing. Clearly, prior to the picket Luckie had been signing for these goods, whereas after June 20 Linbeck began receiving them. *General Electric* taught that the primary employer could not limit traditional primary picketing by constructing a separate gate for suppliers and others whose tasks aid the primary's everyday operations. As fictitious as the notion of separate gates—exempt from picketing—for suppliers, a distinction based on legal ownership of materials could "wash" the supplier out of the entire 8(b)(4) scheme. In addition, *Carrier* noted that ownership of a gate to the primary's premises is not the crucial factor in determining whether picketing there is primary, but rather the function of those using the gate is the significant indicator. Likewise, in this case, ownership of the

materials is not controlling in determining whether a supplier is a proper subject of picketing, but instead we look to the employer to whose use the materials are committed.

For the same reasons discussed above, we find that the Union's picketing in July at times when Luckie's employees were not on the site did not violate 8(b)(4). In July, after giving notice to the Union, Luckie's employees worked in the evening and never appeared on the site during the day. Nevertheless, the Union picketed during the day, as well as during times when Luckie employees were scheduled to be on the site. Linbeck argues that this weekday picketing contravened the *Moore Dry Dock* requirement that picketing must occur when the employer is engaged in the normal course of his business at the site. Often, picketing at times when the primary employer's employees are not scheduled to work on the situs, and are not in fact present, does violate the above *Moore Dry Dock* requirement. *See Linoleum & Carpet Layers, Local 1236 [Cascade Employer's Association]*, 180 N.L.R.B. No. 40, 73 L.R.R.M. 1159 (1969); *Local 3, IBEW*, 204 N.L.R.B. No. 38, 1973 CCH N.L.R.B. ¶ 25478 (1973). Yet, the question of whether an employer is engaged in his "normal business" is one of fact to be determined only after a careful review of the total circumstances. *Plumbers Local 519 v. N.L.R.B.*, 135 U.S.App.D.C. 105, 416 F.2d 1120 (1965). Thus, when the primary's work is performed on an intermittent basis and his absence from the site is only temporary, the Board has often construed him to be engaged in normal operations on the site. *See e. g., Local 25 IBEW*, 1973 CCH N.L.R.B. ¶ 25003 (1973); *Danielson v. Painters District Council No. 20*, 61 L.C. ¶ 10,417 (D.C.N.Y.1969); *Carpenter's District Council of Southern California, Local 362 [Pace Construction Co.]*, 222 N.L.

---

10. Reply Brief, p. 2. At trial, Linbeck officials indicated that prior to June, Luckie paid for the materials that they used and that after June, Linbeck performed this duty. R. p. 263, 289.

11. The term is Linbeck's: "It is true that prior to Homer Williams' obtaining notice [of a possible picket against Luckie] on June 20, 1974,

some of the material used by Luckie had been owned by Luckie and had come through the Luckie gate (R. 225). However, the *change* was made four days prior to the initial secondary work stoppage (on June 24) by the Union . . . ." Reply Brief, p. 2 (emphasis added).

R.B. No. 104, 197576 CCH N.L.R.B. ¶ 16,565. A factor considered significant by the Board in determining compliance with *Moore* has been whether the primary has afforded the Union any means by which to foretell when the primary will return to the job. If the primary can come and go on the site without giving the Union adequate notice when it will be present, one should not conclude that the primary is not engaged in his normal course of business merely because he is absent; otherwise, the primary could forever play a "hide-and-seek" game with the Union. *New Power Wire and Electric Co.*, 144 N.L.R.B. 1089, 54 L.R.R.M. 1177 (1963). Likewise, the Board has not allowed the employers on a site to benefit from the Union's breach of this *Moore Dry Dock* requirement when these parties have given the Union false and misleading information as to when the primary's employees will be on the job. *IBEW, Local 640 [Timber Buildings, Inc.]*, 176 N.L.R.B. No. 17, 71 L.R.R.M. 1193 (1965). Here, Luckie informed the Union that it would be engaged in operations on the site only during weeknights and weekends. Instead, deliveries of supplies integral to its operation were made during the day—a time when it was supposed to be absent. Even if we accepted Linbeck's argument that legal ownership of materials is dispositive, we note that it never made the Union privy to the change in its own internal accounting system and operations whereby it, instead of Luckie, took title to the materials and began receiving the goods instead of having Luckie employees sign for them. Witnessing the delivery of crushed stone that it knew was intended for Luckie's use, the Union was predictably misled by this maneuver as to Luckie's presence at the site during the day.[12] We agree with the Board that such deliveries constituted engagement in a normal course of business during the day by Luckie. We do not agree with the Administrative Law Judge that Luckie could picket only when

these deliveries were being made since it had no way of predicting that event. Accordingly, we hold that the July picketing, did not constitute secondary activity.

## B. *Covering of Picket Sign.*

The fourth requirement articulated in *Moore Dry Dock* is that pickets at a common site must clearly disclose the object of their picket. As noted above, p. 314 *supra*, Linbeck barricaded Luckie's gate during the latter's absences on weekdays. During four days of picketing, the Union, mistakenly thinking its action an appropriate response to the barricading of Luckie's gate, covered its sign, thus failing to meet the disclosure requirement. In *Electrical Workers, Local 861 [Plaunche Electric]*, 135 N.L.R.B. 250, 49 L.R.R.M. 1446 (1962), however, the Board held that *Moore Dry Dock* standards would no longer be applied on an indiscriminate "per se" basis, but would instead be regarded merely as aids in determining the underlying question of statutory violation. 135 N.L.R.B. at 255. Articulation of this position followed the Supreme Court's criticism in the landmark *General Electric* case that the Board had been applying the *Moore Dry Dock* tests too mechanically in several decisions that had held a violation of the standards to be presumptive of illegal activity. 366 U.S. at 677, 81 S.Ct. 1285. Also, in determining whether a party has violated 8(b)(4), one looks to the object, not the effect, of that party's allegedly impermissible activity. *Ramey Construction Co. v. Local 544, Painters, Decorators and Paperhangers*, 472 F.2d 1127 (5th Cir. 1973); *Construction and General Laborers Local 438 v. Hardy Engineering and Construction Co.*, 354 F.2d 24 (5th Cir. 1965). Thus, in this case, the Board held that in light of all the facts the Union's sporadic violations of the "disclosure" requirement did not reflect an impermissible object under 8(b)(4). For example, the Union had previously picketed in June, and

---

12. The Union also argues that the two visits by Luckie, himself, and his supervisor to the site during the day constituted presence by the primary employer. We do not decide here whether such visits, alone, result in a conclusion that

the employer is engaged in his normal course of business and is thereby subject to picketing even when his employees are not working at the site.

did so again on July 27–31, with an uncovered sign referring to Luckie. Likewise, as it communicated to Linbeck officials, the Union did not cover its sign in an attempt to mislead anyone as to the object of its picket. Rather it concluded, albeit mistakenly, that if Luckie could continue its operations during the day, but deny its presence by barricading its gate, the Union's picket would likewise disappear by covering his sign. Thus, whenever the barricade was removed from the Luckie gate, the pickets marched with an uncovered sign. That the Union picketed only the Luckie gate when it could have legitimately picketed the Linbeck gate as well (*see* discussion at pp. 316–318, *supra*) and that it used the picket who had carried the uncovered sign in June to picket with the covered sign in July supports the Board's inference that the Union did not cover its sign with the prohibited intent, under 8(b)(4), of inducing neutrals to cease doing business with the primary. Indeed, the Union had no reason to believe that covering its signs would help its cause by misleading neutral employees, especially since the record indicates that these neutrals were not misled as to the object of protest of those pickets carrying shrouded signs. When the findings and conclusions of the Board are supported by the record as a whole, the court will not substitute its judgment for that of the agency. *N.L.R.B. v. Standard Forge & Axle Co.*, 420 F.2d 508 (5th Cir. 1969). *Accord, Local No. 519, United Assn. of Journeymen v. N.L.R.B. [H. L. Robertson & Associates, Inc.]* 135 U.S.App.D.C. 105, 416 F.2d 1120, 1123 (1969). Substantial evidence supporting the Board's conclusions on this issue, we do not disturb their findings.

In conclusion, we affirm the Board's decision that neither the June or July picketing by the Union constituted impermissible secondary activity.