882 F.2d 1117
 131 L.R.R.M. (BNA) 3244, 112 Lab.Cas. P 11,407
 MAUTZ & OREN, INC., Plaintiff-Appellee,
v.
TEAMSTERS, CHAUFFEURS, AND HELPERS UNION, LOCAL NO. 279,
affiliated with International Brotherhood of
Teamsters, Chauffeurs, Warehousemen and
Helpers of America, Defendant-Appellant.
 No. 88-2903.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 14, 1989.
Decided July 31, 1989.
As Amended Aug. 11, 1989.
 
 Michael J. Bobroff, Husch, Eppenberger, Donohue, Cornfeld & Jenkins, St. Louis, Mo., for Mautz & Oren, Inc.
 John M. Hosteny, Cavanagh, Hosteny & O'Hara, Springfield, Ill., for Teamsters, Chauffeurs, and Helpers Union, Local No. 279.
 Before CUDAHY, POSNER and RIPPLE, Circuit Judges.
 CUDAHY, Circuit Judge.
 
 
 1
 This case arises out of picketing conducted by the defendant, Teamsters Local 279 (the "Union"), at a construction site supervised by the plaintiff, Mautz & Oren, Inc. At the time of the picketing the Union was involved in a labor dispute with a non-union subcontractor working at the site, J & B Waste Applicators ("J & B"). Mautz & Oren contends that the Union's picketing was not directed solely at J & B, but was intended to bring economic pressure to bear on "neutral," secondary employers to cease doing business with J & B. Mautz & Oren therefore argues that the Union's picketing had an unlawful secondary objective, in violation of section 8(b)(4) of the National Labor Relations Act (the "NLRA"), 29 U.S.C. section 158(b)(4). Mautz & Oren also alleges that the Union's picketing violated the no-strike clause contained in the collective bargaining agreement between the parties. The district court ruled in Mautz & Oren's favor on both the secondary picketing and breach of contract claims. The Union appeals; we reverse and remand for a new trial.
 
 I.
 
 2
 Mautz & Oren, a general contractor engaged in construction work, is signatory to a collective bargaining agreement with the Union. This agreement apparently requires the company to hire only unionized subcontractors. In early 1985 Mautz & Oren was awarded a contract to modify and enlarge a sewage treatment plant in Shelbyville, Illinois. Mautz & Oren engaged J & B to remove sludge from a lagoon at the Shelbyville plant. J & B began work on the site on September 17, 1985. Beryle Redding, president of the Union, visited the job site on September 20. Redding approached Jim Wolfe, owner of J & B, and asked Wolfe whether he would sign a contract with the Union. When Wolfe refused Redding ordered a picket to patrol the entrance to the site.
 
 
 3
 Tom Arnold, chief executive officer of Mautz & Oren, attempted to resolve the dispute between the Union and J & B. After his conciliation efforts failed Arnold informed Redding that Mautz & Oren would institute a reserved gate system at the site. Mautz & Oren and other "neutral" employers (i.e., those employers not directly involved in the Union's dispute with J & B) would use the plant's main gate; J & B and its suppliers were to use a separate gate exclusively.
 
 
 4
 The Union initially respected the reserved gate system, and picketed only the J & B gate. However, two days after the reserved gate system was implemented, Redding determined that the gate system had been "tainted." Redding based this conclusion on two facts: (1) Arnold had repeatedly driven through the gate reserved for J & B; and (2) a fuel truck which serviced J & B equipment had entered the site through the purportedly "neutral" gate. Based on the alleged "taint" resulting from these incidents the Union began picketing both entrances to the site. In response Mautz & Oren filed unfair labor practice charges with the National Labor Relations Board (the "NLRB" or "Board"). An NLRB investigator visited the site and, after being apprised of the facts related above, told the Union that it should remove its pickets or the Board would seek an injunction barring it from picketing. The Union removed the pickets from both gates on October 10.
 
 
 5
 Mautz & Oren filed the present lawsuit on March 31, 1986. The company sought $100,000 in damages under two alternative theories: (1) the Union's picketing was unlawful "secondary activity," because the Union intended to coerce Mautz & Oren, a neutral secondary employer, to cease doing business with J & B and thereby bring indirect economic pressure to bear on J & B; and (2) the Union had breached the no-strike obligation contained in its contract with Mautz & Oren. The Union's answer alleged, as an affirmative defense to the breach of contract claim, that Mautz & Oren had failed to submit this claim to arbitration as required by the collective bargaining agreement.
 
 
 6
 After conducting a two-day bench trial the district court ruled in Mautz & Oren's favor on both counts of its complaint. The court stated the basis for its decision as follows:
 
 
 7
 Looking at the evidence as a whole, it is apparent that the union did attempt at least in part to comply with the [governing legal] standards. However, two key facts tend to rebut the presumption that the pickets were wholly primary in nature. First, on Friday, October 4, pickets remained up at Gate 2 [the neutral gate] despite the fact that J & B Waste did not work that day.... It seems difficult for the union to argue that it was engaged in a wholly primary picket against J & B Waste when pickets remained standing in the absence of the primary employer's presence.
 
 
 8
 Second, once the pickets were removed from Gate # 2, the union ceased to picket J & B Waste at Gate # 1. We agree with Plaintiff that the fact that after the NLRB halted picketing at the Mautz & Oren gate, the union did not continue to picket the J & B Waste gate, is clear evidence of the primary object of the union's picketing and is even stronger evidence that the real dispute was with Mautz & Oren from the very beginning. Hence, we conclude that the picket did have an illegal secondary objective.
 
 
 9
 This in turn answers the breach of contract question. If the union's picket had secondary objectives, they were engaging in a picket in violation of the no strike clause of the collective bargaining agreement.
 
 
 10
 (emphasis added). The court also found that the company had exhausted the contractual grievance procedures in connection with its breach of contract claim. For the Union had filed a grievance alleging that Mautz & Oren had breached the collective agreement by subcontracting work to J & B, and this grievance had been processed through all available phases of the grievance machinery.
 
 
 11
 The Union subsequently filed a motion to amend the court's findings and judgment or for a new trial. In its memorandum in opposition to the motion, Mautz & Oren conceded that J & B had worked at the site on October 4, thus admitting that one of the "two key facts" relied upon by the district court was in error. Despite this concession the district court denied the Union's motion without explanation. The Union appeals.
 
 II.
 A.
 
 12
 The first count of Mautz & Oren's complaint states a cause of action under section 303 of the Labor Management Relations Act, 29 U.S.C. section 187, which creates a private right of action for money damages for any person who is injured by union conduct which violates section 8(b)(4) of the NLRA. Section 8(b)(4), in turn, makes unlawful various forms of secondary boycotting or picketing activity. "The gravamen of a secondary boycott is that its sanctions bear, not upon the employer who alone is a party to the dispute, but upon some third party who has no concern in it. Its aim is to compel him to stop business with the employer in the hope that this will induce the employer to give in to his employees' demands." International Bhd. of Elec. Workers v. NLRB, 181 F.2d 34, 37 (2d Cir.1950) (L. Hand, C.J.), aff'd, 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299 (1951); see also NLRB v. Local 825, Int'l Union of Operating Eng'rs, 400 U.S. 297, 302-05, 91 S.Ct. 402, 406-07, 27 L.Ed.2d 398 (1971); Landgrebe Motor Transp., Inc. v. District 72, Int'l Ass'n of Machinists, 763 F.2d 241, 244 (7th Cir.1985). Where a union has a grievance with the terms and conditions of employment of a certain employer, (the "primary" employer), it must focus its picketing activity on that employer. The union may not exert pressure on an unrelated, "secondary" employer in order to coerce the secondary employer to cease dealing with the primary employer, thereby advancing the union's goals indirectly. If the union acts with "mixed motives," partially primary and partially secondary, its conduct is unlawful under section 8(b)(4); "[i]t is not necessary to find that the sole object of the strike was secondary so long as one of the union's objectives was to influence" the secondary employer to bring pressure to bear on the primary. NLRB v. Enterprise Ass'n of Steam Pipefitters, Local 638, 429 U.S. 507, 530 n. 17, 97 S.Ct. 891, 904 n. 17, 51 L.Ed.2d 1 (1977) (first emphasis original); see also George E. Hoffman & Sons, Inc. v. International Bhd. of Teamsters, Local 627, 617 F.2d 1234, 1241 (7th Cir.), cert denied, 449 U.S. 937, 101 S.Ct. 335, 66 L.Ed.2d 160 (1980).
 
 
 13
 While section 8(b)(4)'s prohibition of "secondary" activity seems straightforward in principle, application of that principle becomes complicated where the primary and secondary employers occupy a common work site. In such "common situs" situations, the union has every right to picket the primary employer at the work site, even though this picketing might incidentally, but foreseeably, have a substantial effect on secondary employers. Section 8(b)(4) proscribes only union activity whose "object" or purpose is to coerce secondary employers. And there is an important distinction between intending to enmesh secondary employers in a dispute not their own, and acting with knowledge that secondary employers will inevitably be affected by the union's actions. Even if the union's picketing has substantial (and foreseeable ) secondary effects, that conduct does not violate section 8(b)(4) unless the employer satisfies its burden of establishing that the union intended to cause disruption of the secondary employer's business.[1]
 
 
 14
 In order to provide an evidentiary framework in which to evaluate claims of illegal secondary motivation in common situs cases, the NLRB adopted what have come to be known as the Moore Dry Dock standards. Under these standards, a union's picketing is presumed to be lawful primary activity if:
 
 
 15
 (a) The picketing is strictly limited to times when the situs of the dispute is located on the secondary employer's premises;
 
 
 16
 (b) At the time of the picketing the primary employer is engaged in its normal business at the situs;
 
 
 17
 (c) The picketing is limited to places reasonably close to the location of the situs; and
 
 
 18
 (d) The picketing discloses clearly that the dispute is with the primary employer.
 
 
 19
 Sailors' Union of the Pacific (Moore Dry Dock), 92 N.L.R.B. 547, 549 (1950). These standards have been repeatedly applied by the Board and the courts to assess claims that a union harbored unlawful secondary motives while engaging in picketing. However, both the NLRB and the courts have stressed that the Moore Dry Dock standards are not to be applied mechanistically, but with common sense; while compliance with (or violation of) the standards may give rise to a presumption of lawfulness (or illegality), these standards are not dispositive. The question throughout remains a factual inquiry into the union's actual state of mind under the totality of the circumstances.[2]
 
 
 20
 The Moore Dry Dock standards are not especially helpful to secondary employers where the neutral and primary employers enter and leave the common work site through a single gate. The union is entitled to picket at the common entrance, since this is its only means of communicating its message to the primary employer's workforce (union members generally have no right to enter the work site to picket at the specific location of the primary's operations). And, if a neutral employer has a unionized workforce, it is likely that its employees will refuse to cross the picket line, even though the pickets are directed at an unrelated entity. In order to minimize the disruption of their operations during picketing at a common work site, neutral employers will often seek to establish a "reserved gate" system, whereby the entrance to the site used by neutral employees and suppliers is physically separated from the entrance used by the employer who is the primary target of the union's picketing. "The reserve gate system at construction sites is an attempt to make concrete the application of the [Dry Dock ] standards." Constar, Inc. v. Plumbers Local 447, 748 F.2d 520, 522 (9th Cir.1984). If a valid reserve gate system is established and maintained, and the union continues to picket a gate used exclusively by neutrals, this would establish that the union is not limiting its picketing "to places reasonably close to the ... situs" of its dispute with the primary employer, in violation of the third Dry Dock criterion. On the other hand, if the union respects the reserved gate system and pickets only the primary's separate gate, the neutral employer's operations will generally be unaffected by the picketing--apparently union protocol does not require union workers to refuse to enter a work site where the site is only being picketed at another entrance.[3]
 
 
 21
 Even after a valid reserved gate system has been established, it is still necessary to determine whether the system was being properly maintained at the time of the challenged union conduct. If the neutral gate has been "tainted" due to improper use by the primary employer or its suppliers,[4] the union then has a right to picket at all entrances to the site.[5] The question of taint is an extremely difficult factual and legal question. The Board has stressed repeatedly that "gate pollution" does not occur where the primary employer commits "isolated" or "de minimis " violations of the reserved gate system; instead, the separate gates are only tainted where the employer has engaged in a "pattern of destruction of the reserve gate system."[6] Thus, even in the face of admitted breaches of the reserved gate system, the NLRB will often find that a union has violated section 8(b)(4) by picketing a neutral gate. Such a finding may be made if, months or perhaps years after the events in issue, the Board concludes that the employer took "reasonable precautions" to insure that all employees respected the separate gates, or engaged in "diligent efforts" to correct any abuses which had occurred.[7] On the other hand, the Board has found that a single, aborted attempt to deliver supplies to the primary employer through the neutral gate was sufficient to demonstrate that the reserved gate system had broken down.[8]
 
 
 22
 It may also be necessary to determine the alignment of the party who is alleged to have violated the gate system. In general, the primary employer and its suppliers may use the reserved primary gate only on pain of broadening the front to include all entrances to the common site. However, certain suppliers who service all employers at the site, and whose services are unrelated to the normal business of the primary employer (such as sanitation or food services), may use the neutral gate with impunity.[9] At the same time, persons who might at first blush appear to be neutrals may violate the gate system if it is found that the putatively "neutral" employer was in fact a "joint employer" with, or "ally" of, the primary employer.[10]
 
 
 23
 Finally, even if a bona fide, substantial "pattern" of violations of the reserved gate system has occurred, thus "tainting" or "polluting" the neutral gate, the employer may "rehabilitate" the gate system by redoubling its efforts to insure that the gates are respected and informing the union that the gates have been reestablished and will in the future be properly maintained.[11]
 
 
 24
 Given the myriad of rules governing the reserved gate system, it is not surprising that the Board has conceded that findings of an unlawful secondary objective are necessarily made on an "ad hoc basis."[12] While it may be appropriate for the NLRB to enter prospective cease-and-desist orders based on technical violations of the "more nice than obvious"[13] rules we have discussed, we do not believe that, in this highly complex sphere, a union should be amerced in money damages where its actions are based on a good faith (although perhaps erroneous) interpretation of the legal consequences of events at the site. See Constar, Inc. v. Plumbers Local 447, 568 F.Supp. 1440, 1449 (E.D.Cal.1983), aff'd, 748 F.2d 520 (9th Cir.1984).[14] Especially in the context of picketing at construction sites, where the union's "window of opportunity" to picket is measured in days or weeks, a union must necessarily respond promptly to occurrences at the site. By taking account of the union's subjective interpretation of what the law requires, we allow the union sufficient room to maneuver in the ambiguous legal environment in which it must operate.
 
 B.
 
 25
 The district court based its finding that the Union acted with an unlawful secondary objective on "two key facts": (1) the Union picketed the site on October 4, 1985, when J & B was not working; and (2) the Union removed pickets from both gates after the NLRB investigator informed the Union that it could no longer picket the neutral gate.
 
 
 26
 Mautz & Oren conceded, both in the district court and in its appellate brief, that the district court's first "key fact" was erroneous: J & B did work at the site on October 4, and therefore the Union's picketing on that date in no way violated the second Moore Dry Dock standard. At oral argument, counsel for Mautz & Oren attempted to minimize the impact of this concession. However, there simply is no room to "interpret" the company's statements as anything less than a frank concession that one of the two "key facts" on which the district court relied was incorrect. See Plaintiff-Appellee's Brief at 15 n. 4 ("The district court was in error when it found that J & B was not present on the job site on October 4, 1985."). And it is our settled practice to bar a litigant from employing oral argument to raise new arguments, or repudiate arguments consistently presented in the district court and on appeal. See, e.g., Dovenmuehle v. Gilldorn Mortgage Midwest Corp., 871 F.2d 697, 701 n. 5 (7th Cir.1989); Lim v. Central DuPage Hosp., 871 F.2d 644, 647-48 (7th Cir.1989) ("oral argument in this court [is] too late for advancing new (or what is the same thing, reviving abandoned)" arguments).
 
 
 27
 We are left, then, with only the second of the "two key facts" to support the district court's opinion. It could be argued, with some force, that the case should be reversed and remanded for a new trial whatever the correctness of this second finding since it is impossible to know whether the district court would have ruled as it did based only on "[one] key fact[ ]." However we need not decide whether the district court would have determined that its second factual finding was independently sufficient to support the judgment. For we believe that this finding too was clearly erroneous, and therefore the case must be reversed and remanded for a new trial.
 
 
 28
 The district court's chain of reasoning in connection with its second finding was as follows: the NLRB investigator ordered the Union only to remove pickets directed at secondary employers; the Union, however, removed all of its pickets after the investigator's visit; the Union must have believed that it was not worthwhile to picket if its economic pressure would only bear on J & B; therefore the Union had an unlawful secondary objective "from the very beginning."
 
 
 29
 The court's finding that the NLRB ordered the Union to cease picketing only directed at secondary employers is based on the written settlement agreement executed by the parties after the investigator's visit to the site. However, the Union could not have pulled its pickets in reliance on the written agreement since that agreement was not mailed to the parties until October 24, two weeks after the pickets were removed. Therefore the Union's action could only have been based on the oral warning given by the NLRB investigator at the time of his visit. And both Arnold, Mautz & Oren's CEO, and Union president Redding testified that it was their understanding that the NLRB investigator told the Union to pull all pickets from the site. See Trans. at 207 (testimony of Arnold) (settlement agreement provided "that the union agrees not to do anything to Mautz & Oren [ ] or to J & B Applicators any more") (emphasis added); id. at 426-28, 457-58 (testimony of Redding). Mautz & Oren has not pointed us to any record evidence which would suggest a different understanding of the oral agreement. Since there is apparently nothing in the record to support the district court's second "key" factfinding, we hold that this finding is clearly erroneous, and reversal should follow. See Fed.R.Civ.P. 52(a); see also Amadeo v. Zant, 486 U.S. 214, ---- - ----, 108 S.Ct. 1771, 1777-80, 100 L.Ed.2d 249 (1988); Anderson v. Bessemer City, 470 U.S. 564, 573-76, 105 S.Ct. 1504, 1511-13, 84 L.Ed.2d 518 (1985); Shore v. Dandurand, 875 F.2d 656, 659-60 (7th Cir.1989); Louis Vuitton S.A. v. Lee, 875 F.2d 584, 589-90 (7th Cir.1989).
 
 
 30
 Mautz & Oren nevertheless argues that there are sufficient facts in the record to support the district court's judgment. Most prominently, the company argues that an unlawful secondary objective is established by the fact that the Union picketed the "neutral" gate after a valid reserved gate system had been established. The Union has argued consistently, however, that the neutral gate had been "tainted" and that it was therefore fully justified in picketing both gates. As our earlier discussion should indicate, determining whether a neutral gate has been "tainted" is an extremely complex, fact-specific task. To decide whether the Union was justified in picketing both entrances to the site the court must determine: (1) whether the facts the Union alleges as constituting "gate pollution" in fact occurred; (2) whether these events constituted a de minimis breach of the reserved gate system, or instead a "pattern of destruction"; (3) whether the company effectively "rehabilitated" the gate system, if it had been tainted; and (4) whether the Union could have believed in good faith that it was legally justified in picketing the neutral gate, whatever the merits of that conclusion. We will not attempt to resolve these factual questions on appeal. Since we will not make factual findings on matters the district court ignored, the company's argument is, in essence, that we should accept the district court's ultimate finding of "unlawful secondary object" without the benefit of any specification of the predicate facts which support that conclusion. We have repeatedly stated, however, that a district court's finding of "ultimate facts" must be reversed where the district court has failed to make subsidiary factual findings, thus making it impossible to follow its chain of reasoning. See Jones v. Jones Bros. Construc. Co., 879 F.2d 295 at 297-99, 300 (7th Cir. 1989); Shore, 875 F.2d at 660; Andre v. Bendix Corp., 774 F.2d 786, 800-01 (7th Cir.1985); Mozee v. Jeffboat, Inc., 746 F.2d 365, 370-73 (7th Cir.1984). This is just such a situation; accordingly the case will be reversed and remanded for a new trial on Mautz & Oren's secondary picketing claim.
 
 III.
 
 31
 The district court also held that the union breached the no-strike clause of the parties' collective bargaining agreement. The court expressly stated that its ruling on the contract claim was predicated on the finding of an 8(b)(4) violation. Since the district court's finding that the Union acted with an unlawful secondary objective requires a new trial, the breach of contract claim must similarly be reversed and remanded.
 
 
 32
 While reversal of the section 8(b)(4) finding itself justifies reversal of the breach of contract ruling, we must address one issue which is bound to recur on remand. In its answer to the complaint the Union asserted as an affirmative defense that Mautz & Oren had an obligation to arbitrate its contract claim, but had failed to do so. Mautz & Oren contends that arbitration was unnecessary in the circumstances of this case; if arbitration was appropriate, Mautz & Oren argues that either the Union waived the arbitration defense or the grievance filed by the Union (alleging that Mautz & Oren had violated the contract by subcontracting to J & B) excused the plaintiff from filing a separate grievance. We cannot accept Mautz & Oren's arguments, and therefore hold that the district court erred by rejecting the Union's contention that resort to arbitration was a necessary prerequisite to Mautz & Oren's section 301 suit.
 
 
 33
 Mautz & Oren's most general assertion, that prior resort to arbitration is unnecessary in a section 301 breach of contract action, is simply untenable. The Supreme Court has specifically held that an employer must exhaust available arbitral remedies before suing a union under section 301 for damages related to an alleged breach of a no-strike obligation. Drake Bakeries Inc. v. Local 50, Am. Bakery Workers Int'l, 370 U.S. 254, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962).[15]
 
 
 34
 Mautz & Oren's second argument, that the Union failed to preserve its right to arbitration, presents a closer question. The Union raised the arbitration issue only as an affirmative defense in its answer. In addition, the Union should have moved for an order to compel arbitration, or sought a stay of the litigation pending arbitration, in order to properly advise the court of its position that the litigation should not proceed without prior resort to the contractual grievance machinery. However, although the Union's litigation strategy is questionable, the pleading of its affirmative defense should have alerted the court and the plaintiff to the Union's contention that arbitral remedies should be exhausted before resorting to suit. In these circumstances, we believe that the Union preserved its claim that the action should be held in abeyance pending arbitration. This is an especially apt outcome here, since it was Mautz & Oren, and not the Union, which was seeking relief for an alleged violation of the collective agreement; the primary responsibility to initiate arbitration proceedings was therefore on Mautz & Oren, not the Union.[16]
 
 
 35
 Finally, Mautz & Oren contends that available grievance procedures were exhausted here, since the Union filed a grievance challenging Mautz & Oren's authority to engage J & B, a non-union subcontractor. Mautz & Oren argues that it should not be required to file a "redundant" grievance. However the issues involved in the two proceedings would be substantially different, despite the significant factual overlap between the claims. The primary issue involved in the Union's grievance required construction of the company's contractual undertaking to employ only unionized subcontractors. If Mautz & Oren had filed a grievance, the central issue would have been whether the Union engaged in a prohibited "strike" when no Union members were working for Mautz & Oren at the time of the picketing. Mautz & Oren argues that the Union "struck" Mautz & Oren by convincing its employees to stay off the job; plaintiff points us to the statutory definition of a "strike" contained in 29 U.S.C. section 142(2) to support this contention. However, whatever the definition of a "strike" in the federal labor laws, the controlling question here is whether the Union engaged in a "strike" within the meaning of the collective agreement. While it is possible that the parties to the contract intended to adopt the statutory definition of a "strike," this is hardly a necessary conclusion. The meaning of the word "strike" in the contract can only be determined by referring to the negotiating history of this agreement and the "common law of the shop" reflecting the parties' working understanding of the contract's terms. The Supreme Court has repeatedly stated that these considerations are more appropriately addressed by an arbitrator. See generally AT & T Technologies, Inc. v. Communication Workers of Am., 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986); The Steelworkers Trilogy, 363 U.S. 564, 574, 593, 80 S.Ct. 1343, 1347, 1358, 4 L.Ed.2d 1403 (1960); Chicago Newspaper Publishers' Ass'n v. Chicago Web Printing Pressmen's Union No. 7, 821 F.2d 390, 395-97 (7th Cir.1987).
 
 
 36
 For these reasons we conclude that Mautz & Oren should have resorted to arbitration before filing suit under section 301. On remand, Mautz & Oren's contract claim should be stayed pending exhaustion of available grievance procedures. Any question regarding the timeliness of Mautz & Oren's grievance should be left for decision by the grievance committee or arbitrator. Beer Sales Drivers, Local 744 v. Metropolitan Distribs., Inc., 763 F.2d 300, 302-03 (7th Cir.1985); Chicago Typographical Union No. 16 v. Chicago Sun-Times, Inc., 860 F.2d 1420, 1424 n. 4 (7th Cir.1988); cf. International Union of Operating Eng'rs, Local 150 v. Flair Builders, Inc., 406 U.S. 487, 92 S.Ct. 1710, 32 L.Ed.2d 248 (1972) (arbitrator, not court, should decide laches issue arising from union's failure to seek arbitration until two years after challenged conduct).
 
 IV.
 
 37
 For the foregoing reasons the judgment of the district court is reversed and remanded for further proceedings consistent with this opinion.
 
 
 38
 REVERSED AND REMANDED.1128>>REVERSED AND REMANDED.[17]
 
 
 
 [1]
 See National Woodwork Mfrs. Ass'n v. NLRB, 386 U.S. 612, 627, 87 S.Ct. 1250, 1259, 18 L.Ed.2d 357 (1967) ("however severe the impact of primary activity on neutral employers, it [is] not thereby transformed into activity with a secondary objective"); Local 761, Int'l Union of Elec. Workers v. NLRB, 366 U.S. 667, 673-74, 81 S.Ct. 1285, 1289-90, 6 L.Ed.2d 592 (1961); Landgrebe Motor Transp., 763 F.2d at 246; Frito-Lay, Inc. v. Local 137, Int'l Bhd. of Teamsters, 623 F.2d 1354, 1361 (9th Cir.) (Kennedy, J.) ("we do not infer intent merely from the foreseeable effect of [the union's] tactics"), cert. denied, 449 U.S. 1013, 101 S.Ct. 571, 66 L.Ed.2d 472 (1980)
 
 
 [2]
 See, e.g., Local 761, Int'l Union of Elec. Workers v. NLRB, 366 U.S. 667, 677, 81 S.Ct. 1285, 1291, 6 L.Ed.2d 592 (1961); NLRB v. Ironworkers Local 433, 850 F.2d 551, 554 (9th Cir.1988); J.F. Hoff Elec. Co. v. NLRB, 642 F.2d 1266, 1269-70 (D.C.Cir.1980), cert. denied, 451 U.S. 918, 101 S.Ct. 1997, 68 L.Ed.2d 310 (1981); Helgesen v. International Ass'n of Bridge Ironworkers, Local 498, 548 F.2d 175, 181 (7th Cir.1977); Local 519, United Ass'n of Journeymen Plumbers v. NLRB, 416 F.2d 1120, 1125-26 (D.C.Cir.1969) (only "substantial departure[s]" from Dry Dock standards raise presumption of unlawful secondary motivation); Constar, Inc. v. Plumbers Local 447, 568 F.Supp. 1440, 1444-47 (E.D.Cal.1983), aff'd, 748 F.2d 520 (9th Cir.1984); Ironworkers Local 433 (United Steel), 293 N.L.R.B. No. 74, slip op. at 4-5 (April 10, 1989); International Union of Operating Eng'rs (Linbeck Construc. Co.), 219 N.L.R.B. 997, 998-99 (1975) ("partial and sporadic breach[es]" do not establish unlawful secondary object where union "substantial[ly] compli[ed]" with Dry Dock criteria), enf'd, 550 F.2d 311 (5th Cir.1977)
 
 
 [3]
 The Supreme Court has specifically approved the use of separate gates to cabin a labor dispute at a multiemployer work site, although the Court has cautioned that the neutral gate must not be used by persons whose work is directly related to the primary employer's normal business operations. United Steelworkers of Am. v. NLRB, 376 U.S. 492, 84 S.Ct. 899, 11 L.Ed.2d 863 (1964); Local 761, Int'l Union of Elec. Workers v. NLRB, 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961)
 
 
 [4]
 The reserved gate system is a "one-way street." The separate gate system is "tainted" only where employees or suppliers of the primary employer use the reserved, "neutral" gate; however, if neutral employees use the primary's gate, voluntarily subjecting themselves to the coercive power of the union's picketing, no "taint" occurs. International Bhd. of Carpenters, Local 316 (Lauren J. Thornhill), 283 N.L.R.B. No. 16, ALJ op. at 6 (Feb. 26, 1987); Local 32B-32J, Serv. Employees Int'l Union (New York Ass'n for the Blind), 250 N.L.R.B. 240, 247 (1980) ("because some [neutral] employees are willing to cross a primary picket line at a primary entrance[,] such occurrence does not remove the protection of a reserve secondary gate for those employees who wish to avail themselves of such immunity and protection"); National Ass'n of Broadcast Employees, Local 31 (CBS Inc.), 237 N.L.R.B. 1370, 1378 (1978), enf'd, 631 F.2d 944 (D.C.Cir.1980); United Bhd. of Carpenters, Local 639 (Amer. Modulars Co.), 203 N.L.R.B. 1112, 1118 (1973)
 
 
 [5]
 For cases where the Board has found a reserved gate system sufficiently "tainted" to warrant picketing at all entrances to a common work site, see, e.g., International Bhd. of Elec. Workers, Local 211 (Atlantic City Improvement Auth.), 277 N.L.R.B. 1041, 1043-44 (1985); Local 323, Int'l Bhd. of Elec. Workers (J.F. Hoff Elec. Co.), 241 N.L.R.B. 694, 694 n. 1 (1979), enf'd, 642 F.2d 1266 (D.C.Cir.1980), cert. denied, 451 U.S. 918, 101 S.Ct. 1997, 68 L.Ed.2d 310 (1981); International Union of Operating Eng'rs, Local 450 (Linbeck Construc. Co.), 219 N.L.R.B. 997, 997-99 (1975), enf'd, 550 F.2d 311 (5th Cir.1977)
 
 
 [6]
 Plumbers Local 48 (Calvert Gen. Contractors, Inc.), 249 N.L.R.B. 1183, 1183 n. 2 (1980); see also Local 87, Serv. Employees Int'l Union (Pac. Tel. & Tel. Co.), 279 N.L.R.B. 168, 175-76 (1986); Plumbers Local 388 (Chas. Featherly Construc. Co.), 252 N.L.R.B. 452, 460, 462 (1980); Local 32B-32J, Serv. Employees Int'l Union (New York Ass'n for the Blind), 250 N.L.R.B. 240, 240 n. 2, 246-47 (1980)
 
 
 [7]
 See, e.g., International Union of Operating Eng'rs, Local 12 (Hensel Phelps Construc. Co.), 284 N.L.R.B. No. 32, ALJ op. at 6 (June 16, 1987) (no "taint" of reserved gate system where employer "attempted to scrupulously prevent" violations of reserved gate which did occur); International Union of Operating Eng'rs, Local 18 (Dodge-Ireland Co.), 236 N.L.R.B. 199, 199 n. 1 (1978) (no breach of reserved gate system where employer "took every reasonable precaution to assure the integrity of the reserve gate system")
 
 
 [8]
 International Bhd. of Elec. Workers, Local 211 (Atlantic City Improvement Auth.), 277 N.L.R.B. 1041, 1043-44 (1985)
 
 
 [9]
 Ironworkers Local 433 (Chris Crane Co.), 288 N.L.R.B. No. 74, slip op. at 3-4 (April 29, 1988) (lunch truck); International Union of Operating Eng'rs, Local 12 (McDevitt & Street Co.), 286 N.L.R.B. No. 114, ALJ op. at 4 (Nov. 30, 1987) (same); United Bhd. of Carpenters, Local 1622 (Specialty Bldg. Co.), 262 N.L.R.B. 1244, 1246 (1982) ("once-a-week visit by the toilet man" through neutral gate insufficient to establish taint), enf'd, 786 F.2d 903 (9th Cir.1985) (per curiam)
 
 
 [10]
 Ironworkers Local 29 (Hoffman Construc. Co.), 292 N.L.R.B. No. 53, slip op. at 3-4 n. 4, ALJ op. at 46-48 (Jan. 19, 1989); International Union of Operating Eng'rs Local 450 (Linbeck Construc. Co.), 219 N.L.R.B. 997, 999 n. 7 (1975), enf'd, 550 F.2d 311 (5th Cir.1977). Substantial questions may also arise whether or not a particular unrelated corporation is in fact a "supplier" of the primary so that it must enter and exit through the primary gate exclusively. See, e.g., J.F. Hoff Elec. Co. v. NLRB, 642 F.2d 1266 (D.C.Cir.1980), cert. denied, 451 U.S. 918, 101 S.Ct. 1997, 68 L.Ed.2d 310 (1981)
 
 
 [11]
 See, e.g., NLRB v. Carpenters Union Local 1622, 786 F.2d 903, 905 (9th Cir.1985) (per curiam), enf'g, United Bhd. of Carpenters, Local 1622 (Specialty Bldg. Co.), 262 N.L.R.B. 1244, 1246 (1982); International Bhd. of Elec. Workers, Local 332 (W.S.B. Elec., Inc.), 269 N.L.R.B. 417, 421 (1984); Carpenters Local 470 (Mueller-Anderson, Inc.), 224 N.L.R.B. 315, 316 (1976), enf'd, 564 F.2d 1360 (9th Cir.1977)
 
 
 [12]
 Plumbers Local 388 (Chas. Featherly Construc. Co.), 252 N.L.R.B. 452, 461 (1980)
 
 
 [13]
 Local 761, Int'l Union of Elec. Workers v. NLRB, 366 U.S. 667, 674, 81 S.Ct. 1285, 1290, 6 L.Ed.2d 592 (1961)
 
 
 [14]
 In analogous situations, where a defendant acts under the constraint of highly technical regulations of uncertain meaning, courts have allowed that the defendant's good faith misinterpretation of its legal rights and obligations should be a defense to monetary liability, although perhaps not to prospective, injunctive relief. See, e.g., Southern Pac. Communications Co. v. American Tel. & Tel. Co., 740 F.2d 980, 1009-10 (D.C.Cir.1984), cert. denied, 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 380 (1985); MCI Communications Corp. v. American Tel. & Tel. Co., 708 F.2d 1081, 1137-38 (7th Cir.), cert. denied, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983)
 
 
 [15]
 See also Eberle Tanning Co. v. Section 63L, United Food & Commercial Workers, 682 F.2d 430 (3d Cir.1982); Layne-Western Co., v. International Union of Operating Eng'rs, 650 F.2d 155, 159 (8th Cir.1981); Long-Airdox Co. v. United Auto Workers, Local 722, 622 F.2d 70, 72 (4th Cir.1980); Reid Burton Construc., Inc. v. Carpenters Dist. Council, 535 F.2d 598, 600-02 (10th Cir.), cert denied, 429 U.S. 907, 97 S.Ct. 272, 50 L.Ed.2d 188 (1976); Blake Construc. Co. v. Laborers' Int'l Union, 511 F.2d 324, 327-28 (D.C.Cir.1975); see generally Vaca v. Sipes, 386 U.S. 171, 184-85, 87 S.Ct. 903, 913-14, 17 L.Ed.2d 842 (1967) (exhaustion of contractual grievance procedures generally a prerequisite to Sec. 301 damages suit). It appears that under the parties' agreement the employer may initiate grievance proceedings. Thus the contractual grievance machinery would presumably be fully competent to consider and resolve Mautz & Oren's breach of contract claim. Cf. Atkinson v. Sinclair Refining Co., 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962) (employer not required to seek arbitration before filing Sec. 301 damages action where contract provided that only union could initiate grievance proceedings); Faultless Div. v. Local 2040, Int'l Ass'n of Machinists, 513 F.2d 987 (7th Cir.1975) (same)
 
 
 [16]
 Other courts have held that a party has adequately presented its preference for arbitration by raising the issue as an affirmative defense in its answer to the complaint, or as the basis for a motion to dismiss. See, e.g., O'Neal v. Burger King Systems, Inc., 860 F.2d 1341, 1353 (6th Cir.1988) (where plaintiff, the aggrieved party, obligated to institute arbitration, defendant preserved issue by raising lack of prior arbitration as affirmative defense); Maxum Foundations, Inc. v. Salus Corp., 779 F.2d 974, 982-83 (5th Cir.1985); Tenneco Resins, Inc. v. Davy Int'l, AG, 770 F.2d 416, 420-21 (5th Cir.1985); Sedco v. Petroleos Mexicanos Mexican Nat'l Oil Co., 767 F.2d 1140, 1150-51 (5th Cir.1985); I.T.A.D. Assocs., Inc. v. Podar Bros., 636 F.2d 75, 77 (4th Cir.1981); Martin Marietta Aluminum, Inc. v. General Elec. Co., 586 F.2d 143, 146 (9th Cir.1978) (no waiver where defendant raising issue in answer was not party seeking relief, and therefore was not itself obligated to institute arbitration proceedings). But see Reid Burton Construc., Inc. v. Carpenters Dist. Council, 614 F.2d 698, 702-03 (10th Cir.) (union waived right to arbitration by failing to move for stay of district court proceeding, even though arbitration issue raised as affirmative defense), cert. denied, 449 U.S. 824, 101 S.Ct. 85, 66 L.Ed.2d 27 (1980)
 
 
 [17]
 Since we have remanded this case for a new trial, we find it unnecessary to address the Union's argument that the district court improperly denied it an evidentiary hearing on the question of damages