An order denying the petition follows.

Robert S. **FUCHS**, Regional Director of the First Region of the National Labor Relations Board, for and on Behalf of the **NATIONAL LABOR RELATIONS BOARD**

v.

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, LOCAL 115.**

Civ. No. H–77–0014.

United States District Court, D. Connecticut.

Feb. 17, 1977.

---

Thomas Kennedy, N.L.R.B., Boston, Mass., for petitioner.

Norman Zolot, Hamden, Conn., Richard R. Syre, Philadelphia, Pa., Jonathan Axelrod, Bethesda, Md., for respondent.

## RULING ON PETITION FOR PRELIMINARY INJUNCTION

BLUMENFELD, District Judge.

The petitioner, Robert S. Fuchs, Regional Director of the First Region of the National Labor Relations Board ("N.L.R.B."), seeks a preliminary injunction under § 10(*l*) of the National Labor Relations Act, 29 U.S.C. § 160(*l*), to enjoin the picketing currently being conducted by the respondent, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local 115 ("Local 115") at the Bristol, Connecticut location of the Enflo Corporation ("Enflo"). Enflo charges that Local 115's picketing is in violation of 29 U.S.C. § 158(b)(7)(C). Pursuant to an order to show cause, a hearing was held on January 19, 1977; the parties have submitted briefs and proposed findings of fact and conclusions of law.

### I

Between 1959 and February 1976, Enflo, a Delaware corporation, had its principal place of business at Maple Shade, New Jersey. At that location, the company operated a manufacturing facility where it molded and extruded Teflon plastic. During that period, the company had no facility in Bristol, Connecticut. In May 1975, following a representation election, Teamsters' Local 115 was certified by the N.L.R.B. as the collective bargaining representative of the production and maintenance employees of Enflo at its Maple Shade facility.

Contract negotiations between the company and the union began in June 1975. In support of its contract demands, Local 115 struck the company in August 1975; picketing accompanied that strike. Negotiations continued throughout 1975 and culminated on January 29, 1976, when Enflo made a "final offer" to the union. The company indicated that it would close the Maple Shade facility unless the union accepted its offer by February 4, 1976. When this final offer was rejected, on February 4, 1976, Enflo ceased operations at its New Jersey facility. However, the union's picketing continued at that plant and still continues at the present time.

In June 1976, the Philadelphia Regional Office of the N.L.R.B. dismissed charges filed by Local 115 against Enflo. The union had claimed that Enflo had not bargained in good faith. However, the charge did not allege as an unfair labor practice the closing of the Maple Shade facility.[1]

In September 1976, Enflo began operations at Bristol, Connecticut, where it established new corporate headquarters and a new production facility. Some of the machinery from the New Jersey plant was transferred to Bristol and three of the ten employees in the Connecticut plant were formerly supervisors at the New Jersey facility.[2] The Connecticut plant performs slightly different work; the company now skives Teflon, rather than molding it.

On November 15, 1976, Local 115 began picketing Enflo's Bristol location. The picket signs read: "Employees of Enflo on strike; Local 115 Teamsters." The pickets have been instructed by union officials that their objective is to return Enflo's work to the Maple Shade plant.[3] On December 16, 1976, Myron Rudner, president of Enflo, telephoned John Morris, secretary-treasurer of Local 115. Mr. Rudner's testimony concerning that conversation is set forth in the margin.[4] However, in short, Rudner ex-

---

1. According to Local 115's responsive brief, the union has recently filed an unfair labor practice charge against Enflo, alleging that the closing of the Maple Shade facility constitutes a refusal to bargain in good faith. Response of Teamsters' Local 115, ¶ 3; Exh. 1.

2. Transcript at 19. These workers are not within the bargaining unit represented by Local 115 because they were supervisors.

3. Transcript at 33.

4. On direct examination, Mr. Rudner testified as follows:

"Q Can you tell us what was said in this conversation, Mr. Rudner?

"A Well, I called Mr. Morris at his offices and identified myself as Mr. Rudner, Enflo Corporation, and asked him if this was John Morris. And he said yes, this is John Morris.

pressed his view that the union had no right to picket the Bristol plant. Morris responded that the union is on strike with Enflo. While Morris said that he wanted to "sit down and talk up here [in Bristol]," he never said that he wanted to bargain for the Connecticut employees. Nor have the pickets themselves indicated at any time that the union wants to represent Enflo's Connecticut employees.[5] Indeed, Local 115, which has its offices in Philadelphia, has no jurisdiction under the Teamsters' charter to represent employees in Connecticut.[6]

On December 27, 1976, Enflo filed charges with the Regional Director of the N.L.R.B., claiming that Local 115 is committing an unfair labor practice by conducting recognitional picketing at the Bristol plant in excess of 30 days in violation of 29 U.S.C. § 158(b)(7)(C). On January 11, 1977, the union's picket signs were changed to read: "Employees of Enflo Maple Shade on strike; Local 115 Teamsters." On January 14, 1977, the Regional Director filed a petition seeking a preliminary injunction from this court.

## II

Section 10(*l*) of the National Labor Relations Act, 29 U.S.C. § 160(*l*), requires the Regional Director of the N.L.R.B. to petition a district court for appropriate injunctive relief when he has "reasonable cause to believe" that there has been a violation of § 158(b)(7)(C).[7] In determining

I asked him what he was doing up here, picketing our plant in Bristol. And he said, 'Well, we're on strike with you people. We have the right to picket'.

And I said, 'I don't think you have the right to picket up here, not at this plant'. And his comments were, 'Well, if you want to sit down and talk about it, we can sit down and talk about it'.

I said we were having some difficult times, the company was having a very tough time. He went through a pretty long discussion about employers and how they treat people poorly, treat employees poorly.

And I again asked him, 'Well, what are you doing up here? Why are you picketing up here?' And I asked him, you know, if he was going to try and get himself recognized at this plant. And he said, 'Well, we're willing to sit down and talk. Do you want to sit down and talk with me?'

And I said I didn't know. Then I asked him again, you know, what he was doing up here. I reiterated that I didn't think he had the right to be up here. And that was basically it.

At the very end I asked him, or I guess I made a statement just to clarify in my own mind what he had said, and I asked him: 'So you want to sit down and talk up here, is that right?' And he said, 'That's right' . . . ."

On cross-examination, Mr. Rudner testified as follows:

"Q During your conversation with Mr. Morris, did he ever tell you that he wanted to bargain for the Connecticut employees?

"A Yes, that was clear.

"Q It was clear that he wanted to negotiate a contract for the Connecticut employees, or was he saying he wanted to negotiate to bring the work back to New Jersey and talk about the New Jersey employees?

"A I asked him why he was picketing up in Bristol; and, you know, I asked him what he wanted with this plant, essentially. And he said he wanted to sit down and talk up here.

"Q Well, that's where your headquarters were?

"A Right.

"Q But did he say he wanted to bargain for the Connecticut employees?

"A He didn't say that quote, no. But his implication was that.

"Q He didn't say that to you?

"A That wasn't his quote, no. But that's what he was, in essence, saying . . . ."

5. Transcript at 17.

6. Transcript at 31.

7. 29 U.S.C. § 160(*l*) provides in relevant part:

"Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(A), (B), or (C) of section 158(b) of this title, or section 158(e) of this title or section 158(b)(7) of this title, the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any United States district court within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect

whether an injunction under § 10(*l*) should issue, the district court's role is admittedly a narrow one. *McLeod v. National Maritime Union of America, AFL–CIO,* 457 F.2d 490, 493 (2d Cir. 1972). It need not decide that an unfair labor practice has actually occurred. *Douds v. Milk Drivers and Dairy Employees Union, Local 584, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO,* 248 F.2d 534, 537–38 (2d Cir. 1957). Rather its function is limited to a two-fold inquiry:

"In § 10(*l*) proceedings the function of the federal district court consists of determining (1) whether the temporary injunctive relief would be 'just and proper' in terms of general equitable principles and (2) whether there is 'reasonable cause' for the Regional Director 'to believe such [unfair labor practice] charge is true and that a complaint should issue,' . . . ."

*McLeod v. Local 25, International Brotherhood of Electrical Workers, AFL–CIO,* 344 F.2d 634, 638 (2d Cir. 1965). ("*McLeod v. Local 25*").

However, despite this limited role, the Second Circuit has recognized that the district court should not serve merely as a "rubber-stamp" for the Regional Director. In *Danielson v. Joint Board of Coat, Suit and Allied Garment Workers' Union, I. L. G. W. U.,* 494 F.2d 1230, 1239 (2d Cir. 1974), ("*Danielson v. Joint Board*"), the court considered the standards governing the issuance of injunctions under § 10(*l*). In so doing, it recognized that at least some scrutiny by the district court is appropriate. The court rejected the Regional Director's contention and the position of several other circuits that the district court is "bound under § 10(*l*) to issue the injunction unless it [is] willing to characterize his contentions as insubstantial and frivolous." *Id.* at 1239–1240 & n.15. On the contrary, it held "that when, after full study, the district court is convinced that the [Regional Di-

rector's] legal position is wrong, . . . it should not issue an injunction under § 10(*l*)." *Id.* at 1245. With these principles in mind, I now consider the propriety of injunctive relief in the present case.

A

The Regional Director has concluded that there is "reasonable cause to believe" that Local 115's picketing of Enflo's Bristol facility constitutes an unfair labor practice under 29 U.S.C. § 158(b)(7)(C). That section of the National Labor Relations Act makes it an unfair labor practice for a labor organization

"to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees: . .

(C) where such picketing has been conducted without a petition under section 159(c) of this title being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing: *Provided,* That when such a petition has been filed the Board shall forthwith, without regard to the provisions of section 159(c)(1) of this title or the absence of a showing of a substantial interest on the part of the labor organization, direct an election in such unit as the Board finds to be appropriate and shall certify the results thereof: *Provided further,* That nothing in this subparagraph (C) shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does

to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or tempo-

rary restraining order as it deems just and proper, notwithstanding any other provision of law . . . ."

not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services.

. "Nothing in this paragraph (7) shall be construed to permit any act which would otherwise be an unfair labor practice under this subsection."

■ Thus, the purpose of § 158(b)(7)(C) is to proscribe picketing for the purpose of forcing or requiring an employer to recognize and bargain with the union; or forcing or requiring employees to accept the union as their bargaining representative. It does not prohibit picketing whose objective is neither recognitional nor organizational. *See, e. g., N. L. R. B. v. Knitgoods Workers Union Local 155, International Ladies Garment Workers, AFL–CIO*, 403 F.2d 388, 390 (2d Cir. 1968) ("*N. L. R. B. v. Knitgood Workers*"). There is a distinction between recognitional picketing and picketing in aid of bargaining negotiations. As it is undisputed that the picketing has continued at Enflo's Bristol plant in excess of 30 days, the only issue is whether the object of that picketing is recognitional, that is, whether the picketing is designed to induce recognition of Local 115 as the bargaining agent of Enflo's Connecticut employees, or whether it is designed solely to protect Enflo's New Jersey workers, for whom Local 115 is the certified representative.[8]

■ The Regional Director's determination of Local 115's purpose in picketing Enflo is a question of fact. *N. L. R. B. v.*

*Knitgoods Workers, supra*, 403 F.2d at 390. In *Danielson v. Joint Board, supra*, 494 F.2d at 1245, the Second Circuit said that .

"When 'reasonable cause to believe' turns on disputed issues of fact, the Regional Director may assume these in favor of the charge and the district court should sustain him if his choice is *within the range of rationality.* If differing inferences may *fairly be drawn* from the facts he has found, he may choose the one more favorable to the charging party, and this too should· be upheld." (Emphasis added).

Based on the evidence presented at the hearing and my study of the record, I am unable to conclude that the Regional Director's determination that Local 115 is engaged in recognitional picketing is "within the range of rationality" or based upon inferences which are "fairly drawn."

In support of his finding that the union is engaged in recognitional picketing, the Regional Director relies heavily on the testimony of Enflo's president, Myron Rudner.[9] Rudner testified that during a conversation with John Morris, the union official indicated a desire to meet with· him in Bristol. Based on that statement, it is Rudner's *impression* that Morris is seeking to represent Enflo's Connecticut workers in contract negotiations. However, balanced against this *impression* are the following undisputed facts which reveal that the union's objective is merely to protect the New Jersey employees, for whom it is the certified representative, by returning Enflo's work to Maple Shade: by Rudner's own admission, Morris never indicated that the union wants to represent Enflo's Connecti-

---

**8.** The Regional Director does not argue that the picketing would be illegal, even if it were not found to be recognitional. Indeed, he accepts the union's legal theory, but refutes its claim that the picketing is recognitional. Memorandum of Law in Support of Petitioner's Motion for Injunctive Relief at 5. ("Memo in Support").

**9.** The Regional Director points to other circumstantial evidence to support his conclusion that the picketing is recognitional. Memo in Support at 4–5. He emphasizes the difference in

work performed at the Connecticut plant and the fact that the New Jersey plant is no longer operating. However, Enflo also has a Canadian plant and the union is seeking to return work from that plant, as well as from the Connecticut facility. Response of Teamsters' Local 115, ¶ 2. In any event, the feasibility of returning work to Maple Shade is not at issue. The only question is the purpose of the union's picketing, not the likelihood of the success of its demands.

cut workers;[10] Local 115's pickets have been instructed that the goal of the picketing·is to return the work to Maple Shade; the pickets themselves have never indicated to Rudner that the union is seeking to represent the Connecticut workers; the message of the picket signs is only that Local 115 is striking Enflo; the union continues to picket Enflo's Maple Shade facility. Furthermore, all of these facts are corroborated by the additional fact that Local 115, which is based in Philadelphia, is not authorized and does not have jurisdiction under the Teamsters' charter to represent workers in Connecticut.

Morris expressed a willingness to meet with Rudner in Bristol only because Enflo's corporate headquarters are now located there. He is seeking to protect the interests of Enflo's New Jersey workers, not to represent Enflo's Connecticut employees in contract negotiations. In light of the overwhelming undisputed evidence to the contrary, I cannot give the "benefit of the doubt" to the Regional Director, *Seeler v. Trading Port, Inc.,* 517 F.2d 33, 36–37 (2d Cir. 1975), and ratify, even at this preliminary stage, his determination that there is "reasonable cause to believe" that Local 115's picketing is recognitional and in violation of § 158(b)(7)(C). *Cf. Danielson v. Joint Board, supra.*[11]

### B

There is a further reason for denying preliminary injunctive relief in this case. In addition to ascertaining whether there is "reasonable cause to believe" that there has been an unfair labor practice, the district court must also consider whether injunctive relief is "just and proper." This requirement invokes the traditional equity

considerations of the court. *Danielson v. Local 275, Laborers International Union of North America, AFL–CIO,* 479 F.2d 1033, 1036 (2d Cir. 1973); *McLeod v. Local 25, supra.*

The Second Circuit has yet to decide whether "irreparable injury" must be demonstrated before a § 10(*l*) injunction can issue. However, it has established that the injunction must be premised upon preventing some injury, either to the employer or to the general public. *Danielson v. International Brotherhood of Electrical Workers, Local Union 501,* 509 F.2d 1371, 1375 (2d Cir. 1975). *See also, Danielson v. International Organization of Masters, Mates and Pilots, AFL–CIO,* 521 F.2d 747, 756 (2d Cir. 1975); *Fuchs v. Teamsters Local Union No. 671,* 398 F.Supp. 243, 249–50 (D.Conn.1975). The Regional Director has presented no evidence to establish such injury. Indeed, there is nothing in the record to indicate how many pickets are involved and what impact that picketing is having either on the Enflo corporation or on the general public's interest in the free flow of commerce.

### III

Unless this district court is to serve as the "rubber stamp" which the Second Circuit has said it cannot be, some scrutiny of the Regional Director's conclusions is necessary. While fully cognizant of the limited role of a district court in a § 10(*l*) proceeding, my study of the record leaves me "convinced that the [Regional Director's] legal position is wrong." His determination that there is "reasonable cause to believe" that Local 115 is in violation of 29 U.S.C. § 158(b)(7)(C) is without a

---

**10.** Transcript at 18. It is significant to note that Rudner contacted Morris on December 16, 1976, 30 days after the commencement of the picketing at the Bristol plant. The company filed its unfair labor practice charge on December 27, 1976. It would appear that Rudner was seeking to induce Morris to say that the union is seeking to represent the Connecticut workers. Perhaps this is why Rudner was quick to form the impression that Morris wants to see him about the Bristol workers.

**11.** In *Danielson v. Joint Board,* 494 F.2d 1230 (2d Cir. 1974), the court held that a § 10(*l*) injunction should not have issued. The picketing in that case was non-recognitional and, therefore, not prohibited by § 158(b)(7)(C). The local union did not have jurisdiction to represent the picketed employer's workers. *Id.* at 1233, 1236–1239.

factual basis. Therefore, the petition for preliminary injunctive relief is denied. Of course, "the [N.L.R.B.] is free to render whatever decision it deems proper in the unfair labor practice proceedings and to give this opinion whatever weight it chooses; [this] decision is not intended to have any preclusive effect." *Danielson v. Joint Board, supra,* 494 F.2d at 1245.

It is SO ORDERED.