Elizabeth KINNEY, Regional Director of Region 13 of the National Labor Relations Board, For and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Plaintiff,

v.

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 150, AFL–CIO, Defendant.

Civ. No. H91–435.

United States District Court, N.D. Indiana, Hammond Division.

March 13, 1992.

Linda McCormick and Librado Arreola, N.L.R.B., Chicago, Ill., for plaintiff.

Baum and Sigman, Ltd., Pasquale A. Fioretto, Louis E. Sigman and Dale Pierson, Chicago, Ill., William Bevan, III, Pittsburgh, Pa., Lawrence L. Summers, Chicago, Ill., for defendant.

## ORDER

LOZANO, District Judge.

This matter is before the Court on a Petition for Injunction Under Section 10($l$) of the National Labor Relations Act, as amended, filed December 9, 1991, by Elizabeth Kinney, the Regional Director of Region 13 of the National Labor Relations Board. By her Petition, the Director requests this Court to enjoin the International Union of Operating Engineers, Local 105, AFL–CIO (the "Union") and its agents from in any manner disciplining or threatening to discipline employees of Heckett, a division of Harsco Corporation ("Heckett"), who crossed Union picket lines from October 12 to October 18, 1991, until the National Labor Relations Board ("NLRB") resolves the pending charges against the Union. A bench trial was held on this matter on December 18 and 23, 1991, and January 14 and 15, 1992, and the parties submitted proposed findings of fact and conclusions of law. Having presided over the trial, observed the testimony, and reviewed the record in this case, the Court now enters its findings of fact, conclusions of law, and order of judgment pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

The Court hereby finds that:

1. This Court has jurisdiction pursuant to section 10($l$) of the National Labor Relations Act, 29 U.S.C. § 160($l$) (1973) (the "Act").

2. On October 15, 1991, the LTV Steel Company, Inc. ("LTV") and on October 17, 1991, Heckett filed charges with the NLRB against the Union alleging unfair labor practices affecting commerce within the meaning of 29 U.S.C. § 158(b)(4)(i)(ii)(B) (1973). Essentially, Heckett and LTV complain about secondary boycott activity and illegal picketing with respect to LTV'S Plant No. 7, in East Chicago, Lake County, Indiana ("the Plant").

3. The Union maintains an office and place of business within this judicial district.

4. The Union is now, and has been at all times material herein, a labor organization within the meaning of section 2(5) of the Act.

5. Heckett and the Edw. C. Levy Co., Inc. ("Levy") are located on the premises of the Plant.

6. LTV, a corporation with an office and place of business in East Chicago, Indiana, is engaged in the manufacturing and processing of steel.

7. During the past calendar year, a representative period, LTV sold and shipped products, goods, and materials from the Plant valued in excess of $50,000 directly to a point outside the State of Indiana.

8. LTV is now, and has been at all times material herein, an employer engaged in commerce within the meaning of section 2(2), (6) and (7) of the Act.

9. Heckett, a corporation with an office and place of business in Whiting, Indiana, provides metallic recovery, slag separation, and other specialized services for LTV.

10. During the past calendar year, a representative period, Heckett purchased and received at its Whiting, Indiana facility products, goods, and materials valued in excess of $50,000 directly from points outside the State of Indiana.

11. Heckett is now, and has been at all times material herein, an employer engaged in commerce within the meaning of section 2(2), (6) and (7) of the Act.

12. The Heckett employees who crossed Union picket lines from October 12 to 18, 1991 (the "Employees"), are members of the Union and are working under a valid collective bargaining agreement which expires on September 30, 1995.

13. Section 12 of the Employees' collective bargaining agreement states that "[t]here shall be no strikes, work stoppages, slow down, interruption, or impeding of work during the period of this Agreement."

14. The Union was engaged in a labor dispute concerning wages with Levy.

15. As a result, members of the Union picketed the Plant from approximately October 12 to 18, 1991.

16. Approximately 53 employees of Heckett who worked at the Plant and were members of the Union crossed the Union's picket line between October 12 and 18, 1991.

17. The language on the Union's picket signs read as follows: "LOCAL 150, I.U.O.E. ON STRIKE AGAINST E.C. LEVY FOR WAGES."

18. The Plant has separate entrances to the facility, including the Burma Road Gate, the East Bridge Gate, and the West Bridge Gate.

19. On or about October 12, 1991, the Burma Road Gate was posted with the following sign:

ALL OF LEVY'S EMPLOYEES, THEIR SUPPLIERS, THEIR DELIVERY MEN, THEIR SUB CONTRACTORS, AND ALL OTHERS HAVING BUSINESS WITH LEVY, MAY NOT USE THE EAST BRIDGE OR WEST BRIDGE UNDER ANY CIRCUMSTANCES. THEY MAY USE THIS GATE. THE EAST AND WEST BRIDGE GATES ARE RESERVED SOLELY AND EXCLUSIVELY FOR THE USE OF LTV STEEL COMPANY, ITS EMPLOYEES, ITS SUPPLIERS, ITS DELIVERY MEN, ITS OUTSIDE CONTRACTORS, AND ALL OTHERS HAVING BUSINESS WITH LTV STEEL COMPANY EXCEPT LEVY'S EMPLOYEES, THEIR SUPPLIERS, THEIR DELIVERY MEN AND ALL OTHERS HAVING BUSINESS WITH LEVY.

20. The following sign was posted at the East and West Bridge gates:

THIS GATE RESERVED SOLELY AND EXCLUSIVELY FOR THE USE OF LTV STEEL COMPANY, ITS EMPLOYEES, ITS SUPPLIERS, ITS DELIVERY MEN, ITS OUTSIDE CONTRACTORS AND ALL OTHERS HAVING BUSINESS WITH LTV STEEL COMPANY EXCEPT EMPLOYEES OF LEVY, ITS SUPPLIERS, ITS DELIVERY MEN, AND ALL OTHERS HAVING BUSI-

NESS WITH LEVY. ALL OF LEVY'S EMPLOYEES, THEIR SUPPLIERS, THEIR DELIVERY MEN, THEIR SUB CONTRACTORS AND ALL OTHERS HAVING BUSINESS WITH LEVY MAY NOT SUE [SIC] THIS GATE UNDER ANY CIRCUMSTANCES. THEY MUST USE THE BURMA ROAD GATE WHICH HAS BEEN RESERVED SOLELY AND EXCLUSIVELY FOR LEVY'S EMPLOYEES, THEIR SUPPLIERS, THEIR DELIVERY MEN, THEIR SUB CONTRACTORS, AND ALL OTHERS HAVING BUSINESS WITH LEVY.

21. During this time period, the Employees did not have any labor dispute with Heckett, and were obligated to work at the Plant under the terms of their collective bargaining agreement.

22. Mr. Dennis Fillippo, Senior Manager of Labor Relations at LTV, testified that he set up a reserve gate system after he was notified of the strike.

23. Mr. Fillippo stated that the Burma Road Gate was to be used for Levy employees and those doing business with them, and the East and West gates were for LTV employees and their contractors.

24. Mr. Fillippo also testified that LTV used a reserved gate system in the past when Heckett was involved in a labor dispute in 1983, and that this time they used the same signs, except that in 1983 they were in response to the Heckett strike.

25. Mr. Fillippo testified that when he arrived at LTV, before the signs were posted, there were approximately seven people picketing at the East and West Bridge entrances, and only two or three persons picketing at the Burma Road entrance.

26. Mr. Fillippo said that the East and the West Bridge signs were placed on the guard shanty, and the Burma Road Gate sign was posted on the fence leading into the property on the left-hand side.

27. Mr. Fillippo testified that the sign posted at the West Bridge was three feet by four feet, and the words on the three signs were an inch and a half tall.

28. He also added that at about four o'clock on October 12, 1991, he noticed peo- ple picketing at the West Bridge, and at that time a picket captain approached him. Mr. Fillippo told the picket captain to picket at Burma Road, and the captain stated that Mr. Connors, a Union business agent, told him that they were to picket at all three locations, and that their intent was to impact not only Levy employees, but Heckett employees, iron workers, and any other outside contractors performing work on LTV's premises.

29. Mr. Fillippo stated that during this conversation, LTV's reserved gate sign was already up at all locations, and that there were about seven picketers at the East Bridge Gate and two at the Burma Road Gate.

30. Mr. Fillippo testified that signs were posted from 3 p.m. October 12, 1991, until October 19, 1991, and that from the 12th to the 18th he found picketers at the West Bridge Gate.

31. Mr. Fillippo testified that the strike affected the production of steel from October 12 to 18, 1991.

32. On or about October 14, 1991, the Union filed charges against the Employees seeking to have them disciplined for refusing to honor the picket line and to come off of work at the Plant.

33. Mr. Russell Goin, Jr., an employee of Heckett who crossed the Union's picket line and a member of the Union, filed charges with the NLRB. Mr. Goin testified that he had three out of four tires slashed in his driveway on October 20, 1991, after he filed charges with the NLRB. He further stated that he was not aware of anyone that would have slashed his tires, other than the Union.

34. Mr. Goin also added that he had a conversation with Bill Jansma on December 10, 1991, at the Union hall in Merrillville, Indiana. During this conversation, Mr. Goin recalled Bill Jansma stating that who's to say that driving in and out somebody wouldn't get my license plate number and I'd come home one day and my wife or kids had been threatened.

35. Mr. Goin also stated that when he received charges from the Union, he be-

lieved the Union was sending him the message that he was supposed to come off the job.

36. The Union, through its Executive Board, scheduled a "mass trial" on December 12, 1991, for the charges against the Employees.

37. The Union filed charges against the Employees and scheduled the "mass trial" because the Employees refused to honor the Union's picket line.

38. Mr. Steven M. Cisco, a Recording–Corresponding Secretary of the Union, testified that if a Union member is found guilty, he may be fined up to five thousand dollars ($5000.00) and/or expelled from the Union. He also stated that before the member may appeal to the International Union, the member must pay the fine.

39. Mr. Cisco testified that the results of trials are often published in Union newsletters.

40. Mr. Cisco stated that some Heckett employees have top cards, which enable them to run any equipment in the Local, thereby giving the employee a wider range of employment. If the Employees are found guilty, they may lose their top cards. However, expelled members may still get on the Union's out-of-work list after paying a fee.

41. Mr. Cisco also testified that in a strike situation, he would tell Union members not to cross any Union picket line.

42. The NLRB introduced into evidence a Union newsletter as Plaintiff's Exhibit No. 8. The Recording–Corresponding Secretary's Report, authored by Steven Cisco, stated in pertinent part:

On the afternoon of October 12th, a strike began at LTV. I would like to thank all of the members of Local 150 who honored that strike for their unity and support. To those Local 150 members who crossed Local 150 picket lines at Levy, you will realize your error shortly. After all of these years that this administration has repeatedly talked on Unionism, in order to be effective there must be unity and the only way to stay strong to accomplish our goals is to STICK TOGETHER for there is only power in numbers.

On Saturday, October 12th when the strike began at LTV and pickets were set up at Levy, a lot of Local 150 members and (I use the word loosely), working for Heckett, crossed their own picket lines. Their peers have referred to them as "LOWER THAN GUTTERSNIPES, UNION BUSTING CRAWLING SCUMBAGS, who are not worthy of being called Union members." I cannot think of a defense for these guys. Had the situation been reversed, they would have expected a show of support from their fellow Union members. The strike was supported by union members of other trades, but not by members of 150, the trade involved. What an embarrassment they are to the remaining thirteen thousand some hundred members of Local 150 !!!! EVEN THE NON UNION RAT IS BETTER THAN THEY ARE. AT LEAST YOU KNOW WHERE THE NON UNION RAT STANDS....

43. Further, in the same newsletter Ray Connors wrote:

... We must address an injustice to ALL—The majority of Operators working for Heckett Plant $ 7, after being secured in a GOOD contract for the next five (5) years, have wrongfully betrayed every member of Local 150 by continually crossing the Levy LTV pickets manned by our brothers. These people have absolutely no regard for ANYthing but their very OWN weekly and yearly jobs—NO care for what their union card stands for, NO regard for their Brothers. The dastardly deed and dishonor, the greed and absurdity, abandonment and neglect of our union is a wound, but NOT a mortal wound. Learn from this; etch an ever growing PRIDE, ASSURITY, HONOR, AND DETERMINATION in your heart for YOUR union! I must say, at a time like this, the strength, integrity, and HONOR of the few Operators from Heckett that stood TALL and SURE in spite of peer pressure from co-workers should be warmly supported and encouraged.

## CONCLUSIONS OF LAW

Based on these findings of fact, the Court concludes as follows:

1. The NLRB may obtain an injunction in a district court to enjoin unfair labor practices under section 10(*l*), which provides in pertinent part:

> Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(A), (B), or (C) of section 158(b) of this title, or section 158(e) of this title or section 158(b)(7) of this title, the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any United States district court within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of the law....

29 U.S.C. § 160(*l*) (1973).

2. The purpose of section 10(*l*) is to preserve the *status quo* while the NLRB is acting upon an unfair labor practice charge. *Kinney v. Pioneer Press*, 881 F.2d 485, 488 (7th Cir.1989); *Squillacote v. Graphic Arts Int'l Union, Local 277*, 513 F.2d 1017, 1020 (7th Cir.1975) [hereinafter *Graphic Arts I*]; *Levine v. C & W Mining Co.*, 610 F.2d 432, 436–37 (6th Cir.1979); *Compton v. National Maritime Union of Am.*, 533 F.2d 1270, 1276 (1st Cir.1976); *Seeler v. Trading Port, Inc.*, 517 F.2d 33, 38 (2d Cir.1975).

3. A section 10(*l*) injunction must issue if the Board's representative has "reasonable cause to believe such charge is true." *Graphic Arts I*, 513 F.2d at 1020. "[T]he principle concern in determining reasonable cause is the need to maintain the *status quo*." *Id.* (emphasis added). More precisely, this is the need to forestall unlawful economic coercion until a full hearing can be held before the Board. *Id.*

4. In a section 10(*l*) petition:

> [T]he district court is not called upon to decide the merits of an 8(b)(4) charge. The Board does this. The district court guided by equitable principles determines instead whether the Board has reasonable cause to believe the defendant has violated section 8(b)(4) of the Act. If the court finds reasonable cause, it must grant whatever injunctive relief "it deems just and proper".

*Id.* at 1021.

5. The standard of reasonable cause is satisfied if the Regional Director shows that factual issues exist which must be resolved by the Board. *Squillacote v. Graphic Arts Int'l Union*, 540 F.2d 853, 858 (7th Cir.1976) [hereinafter *Graphic Arts II*]. Further, section 10(*l*) commands courts to disregard their traditional reluctance to issue preliminary injunctions when there is a substantial conflict in the evidence. *Id.*

6. When there is a dispute as to issues of fact, the Regional Director should be given the benefit of the doubt. *Id.*

7. The Regional Director "need only demonstrate that [s]he has reasonable cause to believe that the elements of an unfair labor practice are present and that the legal theory upon which [s]he proceeds is 'substantial and not frivolous.'" *Id.* (quoting *Hirsch v. Bldg. & Constr. Trades Council*, 530 F.2d 298, 302 (3d Cir.1976).

8. The NLRB claims that the Union is violating 29 U.S.C. § 158(b)(4)(i)(ii)(B), which provides as follows:

> (b) It shall be an unfair labor practice for a labor organization or its agents—
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> (4)(i) to engage in, or to induce or encourage any individual employed by any

person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in industry affecting commerce, where in either case an object thereof is—

\* \* \* \* \* \*

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided,* that nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

9. In *Kinney v. Pioneer Press,* 881 F.2d 485, 493 (7th Cir.1989), The Seventh Circuit Court of Appeals disavowed the language in its earlier cases that equated injunctions proceeding under section 10(j) and section 10(*l*), and held that the NLRB need not establish reasonable cause for a court to issue a section 10(j) injunction. This Court notes that *Kinney* involved a section 10(j) injunction. However, in discussing the differences between section 10(*l*) and section 10(j), the Seventh Circuit quoted a Second Circuit Court of Appeals' opinion stating that:

... the only distinction between § 10(j) and § 10(*l*)—apart from the fact that the latter can be invoked before issuance of the complaint—is that under § 10(*l*) the Regional Director *must* apply once he "has reasonable cause to believe such charge is true and that a complaint should issue," whereas the Board's deci-

sion to apply under § 10(j) is left to its discretion.

*Id.* at 492 (quoting *Danielson v. Garment Workers,* 494 F.2d 1230, 1242 (2nd Cir. 1974)). The Seventh Circuit interpreted this language to mean that "under § 10(*l*) as under § 10(j) the district court must recur to 'general equitable criteria.'" *Id.* Indeed, subsequent decisions in the Second Circuit have agreed with the Seventh Circuit's interpretation of *Danielson.* See *Kaynard v. Mego Corp.,* 633 F.2d 1026, 1033 (2d Cir.1980); *Seeler v. The Trading Port, Inc.,* 517 F.2d 33, 36 n. 5 (2d Cir. 1975); *Fuchs v. International Bhd. of Teamsters,* 427 F.Supp. 742, 746, 748 (D.Conn.1977); *Fuchs v. Teamsters Local Union No. 671,* 398 F.Supp. 243, 249 (D.Conn.1975). See also *McLeod v. Local 25, Int'l Bhd. of Elec. Workers,* 344 F.2d 634, 638 (2d Cir.1965).

In *Kinney,* the Seventh Circuit remanded the suit to the district court because the court did not lay out the necessary findings required by Federal Rule of Civil Procedure 65(d). *Kinney,* 881 F.2d at 494. The court stated that "an injunction under § 10(j), like all injunctions, is an 'extraordinary remedy' that should be 'granted only in those situations in which effective enforcement of the NLRA is threatened by the delays inherent in the NLRB dispute resolution process,'" and that "[f]ailure to establish irreparable injury and probability of success on the merits dooms any request for an injunction." *Id.* The court then instructed the district court to analyze of the Board's case under the traditional standards used in injunctive cases filed by public officials, citing *FTC v. Elders Grain,* 868 F.2d 901 (7th Cir.1989) and *World Travel Brokers. Id.*

However, *World Travel Brokers* and *Elders Grain* dealt with the Federal Trade Commission Act. In *World Travel,* the Seventh Circuit relied on legislative history that Congress did not intend to burden courts with the requirements imposed by the traditional equity standards. *FTC v. World Travel Vacation Brokers, Inc.,* 861 F.2d 1020, 1028–29 (7th Cir.1988). The court set forth a "public interest" test and found that to issue an injunction under

section 13(b) a court must "1) determine the likelihood that the commission will ultimately succeed on the merits, and 2) balance the equities." *Id.* at 1029. In this case, the parties have not pointed to any legislative history that indicates to this Court that it should disregard traditional equitable principles before issuing an injunction under section 10(*l*).

Further, the *Kinney* court noted that "[s]ection 10(j) tells the district court to do what's 'just and proper', which we read as a statement that traditional rules govern— the approach emphasizing the public interest applied when the government is the plaintiff." *Kinney*, 881 F.2d at 491. After this language, the court cited *Squillacote v. Local 248, Meat & Allied Food Workers*, 534 F.2d 735, 744 (7th Cir.1976). In *Meat Workers*, the court discussed the standard of injunctive relief in section 10(j) cases, and stated:

> It is difficult, if not impossible, to articulate a universally applicable standard; nevertheless, it is clear to us that courts should consider such factors as the need for an injunction to prevent frustration of the basic remedial purpose of the act and the degree to which the public interest is affected by a continuing violation as well as a more traditional equitable considerations such as the need to restore the status quo ante or preserve the status quo.

*Id.* At the time *Meat Workers* was decided, the Seventh Circuit's standards for injunctive relief for section 10(*l*) and section 10(j) petitions were the same. *Id.* at 743–44. Accordingly, this Court holds that the "public interest" test mentioned in *Kinney* was the test articulated in *Meat Workers* as opposed to the two-pronged test in *World Travel Brokers* or *Elders Grain.*

The Director cites *Graphic Arts II* for the proposition that this Court need not apply the traditional equitable principles before issuing an injunction. However, in *Graphic Arts II*, which was a section 10(*l*) case, the district court did, indeed, make a finding of irreparable injury and the Seventh Circuit did not find it improper. 540 F.2d at 857. Moreover, the court elaborated on its public interest test established in *Meat Workers* and balanced the hardships in stating that:

> We recognize that during the pendency of the temporary injunction the unions and their members are prohibited from engaging in a boycott which they contend is lawful, and that if their position is ultimately sustained by the Board their proper exercise of economic pressure to gain their ends will have been delayed. This result must be balanced against the economic losses and the injury to the public that will result if what turns out to be an unlawful secondary boycott is allowed to continue in the face of the Regional Director's reasonable cause to believe that the boycott is illegal.

*Id.* at 859.

■ Finally, even though *Kinney* involved a section 10(j) petition, *Kinney* stated *in dicta* that the only differences between a section 10(j) and a section 10(*l*) petition are that under section 10(*l*), the NLRB must apply for an injunction once it has reasonable cause to believe a violation has occurred, and under § 10(j) there is no reasonable cause requirement, for whether to seek an injunction is left to the Board's discretion. *Kinney*, 881 F.2d at 492. As these are the only material differences between sections 10(*l*) and 10(j) found by the Court, and the Regional Director has not pointed to any other distinction, the Court finds that according to *Kinney*, it must apply the traditional standards used in injunctive cases filed by public officials to determine what relief is "just and proper." *See also N.L.R.B. v. P\*I\*E Nationwide, Inc.*, 894 F.2d 887, 891 (7th Cir.1990) (court reaffirmed that traditional equity principles are applicable to suits under section 10(j)); *American Hosp. Supply Corp. v. Hospital Products, Ltd.*, 780 F.2d 589, 593–594 (7th Cir.1986); *Meat Workers*, 534 F.2d at 744.

10. In order for this Court to issue an injunction, the Director bears the burden of proving the following five elements: (1) the NLRB has no adequate remedy at law; (2) the NLRB will suffer irreparable harm if the temporary restraining order is not issued; (3) the irreparable harm the NLRB

will suffer if the temporary restraining order is not granted is greater than the irreparable harm the Defendant will suffer if the injunction is granted; (4) the NLRB has a reasonable likelihood of prevailing on the merits; and (5) the degree to which the public interest is affected by continuing unlawful labor practices. *Brunswick Corp. v. Jones*, 784 F.2d 271, 273–274 (7th Cir.1986); *Lawson Products, Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1432 (7th Cir.1986).

11. In order to prevail, the Director must satisfy each of these elements. *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 386–387 (7th Cir.1984).

12. The Director must show some likelihood of success. *Somerset House, Inc. v. Turnock*, 900 F.2d 1012, 1015 (7th Cir. 1990). This standard is not difficult to meet, for the Director need only show that its "chances are better than negligible." *Roland Machinery*, 749 F.2d at 386–87.

■ 13. Based on the testimony presented by the Director, the Court concludes that the Director has reasonable cause to believe that the Union has engaged in unfair labor practices within the meaning of section 158(b)(4)(i)(B) and section 158(b)(4)(ii)(B), affecting commerce within the meaning of section 2(6) and (7), and thus has a reasonable likelihood of prevailing on the merits.

14. Section 8(b)(4) makes unlawful various forms of secondary boycotting or picketing activity. "The gravamen of a secondary boycott is that its sanctions bear, not upon the employer who alone is a party to the dispute, but upon some third party who has no concern in it. Its aim is to compel him to stop business with the employer in the hope that this will induce the employer to give in to his employees' demands." *Mautz & Oren, Inc. v. Teamsters, Chauffeurs, and Helpers Union, Local No. 279*, 882 F.2d 1117, 1120–22 (7th Cir.1989) (quoting *International Bhd. of Elec. Workers v. NLRB*, 181 F.2d 34, 37 (2d Cir.1950) (L. Hand, C.J.), *aff'd*, 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299 (1951)).

■ 15. Disciplining a union member for crossing a picket line to work for a neutral employer is a violation of section 8(b)(4). *NLRB v. United Ass'n of Journeymen*, 827 F.2d 579, 580 (9th Cir.1987).

■ 16. Where a union has a grievance with the employment conditions of a certain employer, (the "primary" employer), it must focus its picketing activity on that employer. *Mautz*, 882 F.2d at 1121. A Union may not indirectly affect a primary employer by exerting economic pressure on an unrelated "secondary" employer to coerce the secondary employer to cease dealing with the primary employer. *Id.*

■ 17. Further, to find a violation of section 8(b)(4) there need not be an existing business relationship between a "neutral party" and an employer who is a party to a labor dispute. *Salem Bldg. Trades Council*, 163 N.L.R.B. 33, 35 (1967); *International Bhd. of Elec. Workers*, 230 N.L.R.B. 1017, 1019 (1977), *aff'd*, 574 F.2d 1302 (5th Cir.1978).

■ 18. If a union acts with "mixed motives," meaning that it intends to economically affect both primary and secondary employers, its conduct is unlawful under section 8(b)(4). *Mautz*, 882 F.2d at 1121. " '[I]t is not necessary to find that the *sole* object of the strike was secondary so long as *one of the union's objectives* was to influence' the secondary employer to bring pressure to bear on the primary." *Id.* (emphasis in original) (quoting *NLRB v. Enterprise Ass'n of Steam Pipefitters, Local 538*, 429 U.S. 507, 530 n. 17, 97 S.Ct. 891, 904 n. 17, 51 L.Ed.2d 1 (1977)).

■ 19. Where primary and secondary employers occupy a common work site, distinguishing whether a union is involved in secondary boycott activity is complicated. *Id.* In "common situs" situations, the union may picket the primary employer at the work site, even though this picketing might incidentally, and foreseeably, have a substantial effect on secondary employers. *Id.*

■ 20. Section 8(b)(4) proscribes only union activity whose "object" or purpose is to coerce secondary employers. *Id.*

21. Even if the Union's picketing has substantial and foreseeable secondary ef-

fects, that conduct does not violate section 8(b)(4) unless the employer establishes that the Union *intended* to economically affect the secondary employer's business. *Id.*

22. To provide guidance in evaluating illegal secondary motivation in common situs cases, the NLRB adopted the *Moore Dry Dock* standards. *Id.* Under these standards, a union's picketing is presumed to be a lawful primary activity if:

(A) The picketing is strictly limited to times when the situs of the dispute is located on the secondary employer's premises;

(B) At the time of the picketing the primary employer is engaged in its normal business at the situs;

(C) The picketing is limited to places reasonably close to the location of the situs; and

(D) The picketing discloses clearly that the dispute is with the primary employer.

*Id.*

23. "If a valid reserve gate system is established and maintained, and the union continues to picket a gate used exclusively by neutrals, this would establish that the union is not limiting its picketing 'to places reasonably close to the ... situs' of its dispute with the primary employer, in violation of the third *Dry Dock* criterion." *Id.* at 1122.

24. The Union picketed at both the East and West gates, gates which were reserved for neutral employers and contractors. As such, the Regional Director has reasonable cause to believe that the picketing violated section 8(b)(4) because it was not reasonably close to the situs of the dispute with the primary employer, Levy.

25. The Union's threatened discipline against the Employees induced the Employees to refuse to perform services for Heckett with the object to force or require Heckett to cease using, selling, handling, transporting, or otherwise dealing in the products of, and to cease doing business with LTV and other persons engaged in commerce, or in an industry affecting commerce, in order to force or require LTV to cease using, selling, handling, transporting, or other dealing in the product of, and to cease doing business with Levy. *NLRB v. United Ass'n of Journeymen,* 277 N.L.R.B. 1231, 1232 (1985); *Local 252, Sheet Metal Workers' Int'l Ass'n,* 166 N.L.R.B. 262, 263–64 (1967).

26. This Court further finds that the Regional Director has proven that the NLRB has an inadequate remedy at law and that the NLRB and the Employees will suffer irreparable harm should this Court not issue an injunction. The Employees may be expelled by the Union if found guilty. Further, if found guilty, they may lose their top cards, which enables them to perform a variety of work. Although terminated Employees may be put on an out-of-work list at the Union hall, the Employees will only be able to perform limited jobs without a top card.

There is also the threat of violence should the Union be able to hold a "mass trial." The Employees have been subjected to verbal abuses by other members of the Union, been threatened, and sustained property damage as a result of crossing picket lines. The Employees' refusal to honor allegedly illegal picket lines has been published in a newsletter that is disseminated among the general membership of the Union. The derogatory and inciteful language in the newsletter used by Union members in reference to the Employees' activities further supports this Court's finding that violence may occur at the "mass trials". Because of threatened violence, the Court also finds there is a need to preserve the status quo. The Court further finds that a continuance of these practices will impair the effective enforcement of the National Labor Relations Act due to the delays inherent in the NLRB dispute resolution process. Based on this evidence, the Regional Director has shown that the Employees and the NLRB would have an inadequate remedy at law and suffer irreparable harm should this Court not issue a permanent injunction.

27. This Court finds that upon balancing the relative hardships to the parties, taking into consideration the public

interest, the scales tip in favor of the Regional Director. As to this element, the granting of the preliminary injunction will not result in any harm or prejudice to the Union, other than the possible delay of their proceedings until the outcome of the NLRB proceedings. The Court discounts the Union's position that if not allowed to discipline their members they will lose power to economically influence employers in order to obtain beneficial labor contracts. The inability to discipline approximately 53 employees out of 15,000 union members cannot seriously diminish the Union's ability to muster support from its substantial membership to negotiate favorable collective bargaining agreements. However, if this Court were to not grant the requested relief, and the Union were allowed to continue its unfair labor practices, the Employees may lose their top cards, and could possibly suffer property and personal injury upon attending any "mass trial" scheduled by the Union due to violence. Further, Heckett could suffer a loss of significant number of its employees and correspondingly, experience a decrease in production as it did during the strike. In addition, the NLRB's effectiveness in prosecuting unfair labor practices will be thwarted. Taken in this light, the Employees and the NLRB will suffer greater harm if the preliminary injunction is not granted than the Union would suffer if the injunction is granted.

28. Consequently, the Court finds that the NLRB has proven that equitable relief is just and proper in this circumstance.

29. As this Court has found that the NLRB has reasonable cause to believe a violation of the National Labor Relations Act has occurred, and that equitable relief is just and proper in this situation, 29 U.S.C. § 160(l) directs this Court to issue an injunction.

30. Until the final disposition of the matters involved pending before the National Labor Relations Board, the Union, its officers, representatives, agents, servants, employees, attorneys, and all members, persons and labor organizations acting in concert or in participation with it, are enjoined and restrained from:

A. engaging in proceedings to exact discipline and/or fines from the Employees who crossed the Union's picket line at the Plant from October 12, 1991 through October 18, 1991;

B. engaging in or inducing or encouraging the Heckett employees to engage in a strike or refusal in the course of their employment to use, manufacture, process, transport or otherwise handle or work on any goods, articles, materials or commodities or to perform any services for Heckett, or in any manner or by any means, threatening, coercing or restraining Heckett, where in either case an object thereof is forcing or requiring Heckett to cease using, selling, handling, transporting or otherwise dealing in the products of and to cease doing business with LTV in order to force or require LTV to cease using, selling, handling or otherwise dealing in the products of and to cease doing business with Levy.