NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, AFL–CIO,
LOCAL UNION 903, and its agent, Jimmy G. Russ, Respondents.

No. 77–2980
Summary Calendar.*

United States Court of Appeals,
Fifth Circuit.

June 14, 1978.

Elliott Moore, Deputy Assoc. Gen. Counsel, Michael Murchison, Atty., Janet McCaa, Supervisor, John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Assoc. Gen. Counsel, N.L.R.B., Washington, D. C., for petitioner.

Charles T. Sykes, Jr., Gulfport, Miss., for respondents.

Before GOLDBERG, AINSWORTH and HILL, Circuit Judges.

AINSWORTH, Circuit Judge:

The Board seeks enforcement of its cease and desist order against the International Brotherhood of Electrical Workers, AFL–CIO, Local Union 903, and its agent, Jimmy G. Russ. The administrative law judge determined that the Union had violated section 8(b)(4)(i)(ii)(B) (29 U.S.C. § 158) of the National Labor Relations Act, by engaging in secondary picketing, and the Board adopted his recommended order. The sole issue is whether the Board's finding of an unfair labor practice is supported by substantial evidence. We conclude that there is substantial evidence to support the Board's determination, and therefore enforce the order.

* Rule 18, 5 Cir.; see *Isbell Enterprises, Inc. v. Citizens Casualty Company of New York et al.*, 5 Cir., 1970, 431 F.2d 409, Part I.

Ingalls Shipbuilding operates a facility in Pascagoula, Mississippi. In 1975, Ingalls solicited bids for the construction of restrooms on its premises. At a meeting of the Gulf Coast Building Trades Council in November 1975 (the respondent Union is a member of the Council), the Council President remarked that if Hinton Commercial Contractors, a nonunion employer, received the job, Ingalls would have "problems." Hinton was awarded the contract, and on January 21, 1976, Ingalls advised the Council President that Hinton's employees, subcontractors and suppliers had been instructed to use only a reserve gate situated 500 yards north of the main Ingalls entrance. The reserve gate does not border on a public road, and is entirely within the premises of the Ingalls facility. The public does have access to the reserve gate, although the gate is not generally used by the public. The Council President was also informed that the area immediately outside the reserve gate would be available in the event of labor disputes with Hinton or any of Hinton's subcontractors. Ingalls installed a sign at the reserve gate, indicating that the gate was for the exclusive use of Hinton and its subcontractors. On February 2, 3 and 27, the Building Trades Council picketed the reserve gate.

In late February the Electrical Workers Union learned that Hinton's electrical work was to be performed by nonunion workers, and on April 12, 1976, the Union picketed the Ingalls facility at the juncture of the road leading into the facility and Ingalls' property line. The picket signs stated that the picketing was directed only at Hinton. When the pickets appeared, Ingalls' Director of Labor Relations inquired why the Union was not limiting its picketing to the reserve gate, as the Building Trades Council had agreed. Jimmy Russ, the Union business manager, replied that the Union pickets were not Building Trades pickets, and that he did not picket on private property. By mid-morning Ingalls' Director of Labor Relations delivered a letter to Russ informing him of the existence and use of the reserve gate. Russ then asked to see the reserve gate. After inspecting the reserve gate area, Russ questioned the safety of the pickets if they were to be stationed at the reserve gate. Russ was then informed that Ingalls would provide a security guard for the pickets as it had done during the Building Trades Council picketing in February. The possibility of establishing a reserve gate bordering on the public access road was also discussed. Nevertheless, the Electrical Workers Union continued to picket at the main entrance to the Ingalls facility through the next day, April 13. During the two days of picketing none of Ingalls' employees ceased work, but the employees of two neutral contractors dealing with Ingalls refused to cross the picket line.

The only issue in this case is whether the Union's picketing of the front entrance of the Ingalls facility instead of the reserve gate constitutes a secondary boycott in violation of section 8(b)(4)(i)(ii)(B) of the Act. The statute provides that

(b) It shall be an unfair labor practice for a labor organization or its agents—

.    .    .    .    .

(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

.    .    .    .    .

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees

under the provisions of section 159 of this title: *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.

29 U.S.C. § 158. These provisions in part are designed to protect neutral employers from becoming entwined in labor disputes between the union and the primary employer. It is apparent that Ingalls and the independent contractors whose employees refused to cross the picket line were neutrals in this dispute. However, the proviso to section 8(b)(4)(ii)(B) makes it clear that Congress did not intend to infringe on the right to engage in primary picketing. Courts have long recognized that the distinction between primary and secondary picketing is especially troublesome in the common situs context. *See, e. g., Linbeck Construction Corp. v. N.L.R.B.,* 5 Cir., 1977, 550 F.2d 311, 315–17.

There are, however, some guidelines to follow in determining whether a union has gone beyond the bounds of permissible primary activity. In *Sailors Union of the Pacific [Moore Dry Dock],* 92 NLRB 547 (1950), the Board articulated four factors to guide this decision:

(a) The picketing is strictly limited to times when the *situs* of dispute is located on the secondary employer's premises; (b) at the time of the picketing the primary employer is engaged in its normal business at the *situs* ; (c) the picketing is limited to places reasonably close to the location of the *situs* ; and (d) the picketing discloses clearly that the dispute is with the primary employer. *Id.* at 549.

These guidelines have been used by this court, *see, e. g., Linbeck Construction Corp. v. N.L.R.B., supra,* and the applicability of the four factors is not contested by the Union.

The Board concluded that the third *Moore Dry Dock* criterion had not been met because the picketing was not limited to places reasonably close to the situs of the dispute. This court has stated that the failure to limit picketing to a reserve gate will generally result in a finding of secondary activity in violation of section 8(b)(4). *See id.* at 316. Nevertheless, the *Moore Dry Dock* standards are not to be applied mechanically in determining the existence of the unlawful secondary object, *see id.* at 319. There is, however, no reason to conclude that the Board's application was incorrect or overly "mechanical" in this case. The Union was aware of the existence of the reserve gate, and there was evidence that the President of the Building Trades Council predicted problems for the neutral employer, Ingalls. The administrative law judge recognized that the posting of a reserved gate does not invariably impose a duty on the union to picket only at that site, but still concluded that in this case there was no showing that the attempt of Ingalls to confine picketing to the reserve gate was unreasonable. The Union's claim that the safety of its pickets was in danger at the reserve gate received due consideration from the administrative law judge, but it was found that the basis of such fear was insubstantial, especially in light of Ingalls' offer of a security guard. The fact that the reserve gate did not border on a public road was also rejected as an insubstantial reason for legitimizing the picketing at the main entrance.

■ Our role in reviewing the Board's order is limited to determining whether the Board's decision is supported by substantial evidence on the record as a whole. *See Johns-Manville Products Corp. v. N.L.R.B.,* 5 Cir., 1977, 557 F.2d 1126, 1132; *Universal Camera Corp. v. N.L.R.B.,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). We conclude that substantial evidence supports the Board's finding that failure to limit picketing to the reserve gate area indicates a secondary object in this case. *See N.L.R.B. v. Lafayette Building & Construction Trades Council,* 5 Cir., 1971, 445 F.2d 495, 497; *Markwell & Hartz, Inc. v. N.L.R.B.,* 5 Cir., 1967, 387 F.2d 79, *cert. denied,* 391 U.S. 914, 88 S.Ct. 1808, 20 L.Ed.2d 653 (1968) (where this court enforced Board orders on

the basis that picketing was not limited to the reserve gate).[1]

Enforcement is GRANTED.

---

1. The Seventh Circuit decision relied on by the Union, *Helgesen v. International Asso. of Bridge, Structural & Ornamental Ironworkers, Local Union 498*, 7 Cir., 1977, 548 F.2d 175, is not to the contrary. *Helgesen* was an appeal from a district court decision in favor of the union in a civil suit by the aggrieved employer, rather than a petition for enforcement by the Board. Therefore no "substantial evidence" test was applied. The *Helgesen* court simply failed to find a secondary purpose under the circumstances of that case.

