William A. PASCARELL, Regional Director of Region 22 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,

v.

DRUG, CHEMICAL, PLASTIC & AFFILIATED INDUSTRIES WAREHOUSE EMPLOYEES UNION, LOCAL 815, Respondent.

Civ. A. No. 94–1787.

United States District Court,
D. New Jersey.

May 17, 1994.

National Labor Relations Board by Bradley R. Williams, Newark, NJ, for petitioner.

Henry I. Hamburger, Leonia, NJ, for respondent.

## MEMORANDUM OPINION

WOLIN, District Judge.

This matter is before the Court pursuant to an Order, dated April 21, 1994, as amended April 22, 1994, requiring respondent Drug, Chemical, Cosmetic, Plastic & Affiliated Industries Warehouse Employees Union, Local 815 (the "Union") to show cause why a temporary injunction should not be issued restraining the Union from certain picketing activities pending the final administrative disposition of an unfair labor practices charge filed against the Union by Cosmetic Essence, Inc. ("CEI"). The Court issued the Order to Show Cause upon the application of William A. Pascarell ("Director Pascarell"), Regional Director of Region 22 of the National Labor Relations Board, for and on the behalf of the National Labor Relations Board ("NLRB"), dated April 20, 1994. The Court has reviewed the parties written submissions and has considered the matter pursuant to Federal Rule of Civil Procedure 78.

## BACKGROUND

The genesis of this dispute dates back to November 1993, when Houbigant, Inc. ("Houbigant"), an international designer, marketer and distributor of perfumes and toiletries, summarily fired 200 workers who were then employed at Houbigant's Ridgefield, New Jersey facility. The employment terms for these Houbigant employees were governed by a collective bargaining agreement with the Union.

At or around the same time, Houbigant ceased all production, manufacturing and distributing operations and entered into a subcontracting agreement, under which CEI now performs the manufacturing, processing, packaging and distribution of Houbigant products. Houbigant consequently purchases and supplies to CEI the raw materials required to produce and package the Houbigant products. These materials are delivered for production by common carrier to CEI's East Ridgefield, New Jersey (the "CEI facility").

On November 18, 1991, Houbigant and its affiliated companies filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code. Having dispensed with its manufacturing and distribution systems, Houbigant continues to sell and market its products. In November 1993, CEI also leased to Houbigant office floor space at the CEI facility.

On or about November 15, 1993, following these operational maneuvers by Houbigant, approximately 100 members of the Union commenced picketing outside the CEI facility. The pickets carried signs indicating that the strike was directed at Houbigant, not

CEI. On or about January 1, 1994, CEI established a reserve gate system at the CEI facility's entrance points along Pleasant View Terrace. At the southern entrances on Pleasant View Terrace ("Gates B and C"), CEI posted signs reserving the entrances for the exclusive use of Houbigant, its employees, suppliers and visitors. The northern entrance on Pleasant View Terrace ("Gate A") was marked in similar fashion and was identified as the exclusive entrance for CEI employees, contractors, suppliers and visitors.

With a number of individuals, ranging from fifty-five to one hundred at a time, the Union has continued to picket the CEI Facility, allegedly at both the neutral Gate A and the primary Gate B, by walking a circular path over the approximately 400 yards that separate the two gates. The pickets patrol this area seven days a week, commencing at 6:00 a.m. and concluding at 9:00 p.m., daily.

In March 1994, CEI filed an administrative complaint against the Union, alleging that the Union's activities at Gate A constituted secondary picketing which is proscribed by Section 8(b)(4) of the National Labor Relations Act, as amended ("NLRA"), 29 U.S.C. § 158(b). The complaint was amended on April 18, 1994. Director Pascarell subsequently filed the pending application pursuant to Section 10(*l*) of the NLRA, 29 U.S.C. § 160(*l*), seeking a temporary injunction restraining the Union from picketing at the CEI facility pending final disposition of the administrative action before the NLRB.

## DISCUSSION

■ When considering an application under section 10(*l*) of the NLRA, a district court is not called upon to determine the merits of the unfair labor practice charge, or whether; in fact, such a violation has occurred. *Schauffler v. Local 1291, Int'l Longshoremen's Ass'n*, 292 F.2d 182, 186 (3d Cir. 1961); *Kobell v. Amalgamated Council of Greyhound Unions*, 758 F.Supp. 1060, 1063 (W.D.Pa.1990). The task of resolving the legal and factual questions is reserved exclusively to the NLRB, subject to review by a federal court of appeals under section 10(e) and 10(f) of the NLRA. *N.L.R.B. v. Denver*

*Building & Constr. Trades Council,* 341 U.S. 675, 681–83, 71 S.Ct. 943, 947–49, 95 L.Ed. 1284 (1951).

■ On a section 10(*l*) application, this Court's inquiry is limited to the following three factors: (1) whether the Director has presented a "substantial and nonfrivolous legal theory" that would support a legal conclusion that an unfair labor practice had occurred; (2) whether the facts support the Director's the legal theory; and (3) whether injunctive relief is the just and proper remedy. *Hoeber v. Local 30, United Slate, Tile & Composition Roofers,* 939 F.2d 118, 121–25 (3d Cir.1991) (quoting *Kobell v. Suburban Lines, Inc.,* 731 F.2d 1076, 1085 (3d Cir. 1984)).

■ The burden of proof confronted by Director Pascarell under section 10(*l*) is "relatively insubstantial" and requires only that he have "reasonable cause" to believe that the proffered facts and legal theory support a finding of an unfair labor practice. *Hirsch v. Building and Constr. Trades Council,* 530 F.2d 298, 302 (3d Cir.1976). With these standards in mind, the Court turns to the instant application.

### 1. Substantial and Non–Frivolous Legal Theory

In substance, Section 8(b) of the NLRA states that "[i]t shall be an unfair labor practice" for labor unions to engage—or threaten to engage—in picketing, strikes, or refusals to perform in furtherance of secondary boycotts. 29 U.S.C. § 158(b)(4)(i), (b)(4)(i)(B). These provisions seek to advance the "dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes . . . [while] shielding unoffending employers and others from pressures and controversies not their own." *Denver Building,* 341 U.S. at 692, 71 S.Ct. at 953.

Director Pascarell has presented a substantial and non-frivolous legal theory upon which this Court may grant injunctive relief under section 10(*l*). *See N.L.R.B. v. International Brotherhood of Elec. Workers, Local Union No. 903,* 574 F.2d 1302, 1304 (5th Cir.1978) (upholding N.L.R.B. decision to en-

join failure of union to limit picketing to gate expressly established by a neutral party for the use of employees and suppliers of the party directly involved in the labor dispute).

## 2. Factual Support for Secondary Boycott Theory

To receive temporary injunctive relief under section 10(*l*), Director Pascarell also must establish that the facts of the instant case would satisfy the elements of an unfair labor practice charge—here, a secondary boycott. *See Hoeber,* 939 F.2d at 124. The parties have submitted affidavits on the pending petition, and the Court will look to these to determine whether the facts fit the secondary boycott theory, keeping in mind the "relatively insubstantial burden of proof" confronting Director Pascarell.

■ When a union has a dispute with a certain employer, the "primary" employer, here Houbigant, it must direct its picketing toward that employer and may not apply pressure to an unrelated "secondary" employer, here CEI, in order to force that secondary employer to discontinue its dealings with the primary employer. *Mautz & Oren v. Teamsters Local No. 279,* 882 F.2d 1117, 1121 (7th Cir.1989). The Union's picketing will ultimately be construed as an unlawful labor practice if it can be shown that the Union sought to exert pressure on Houbigant via coercive tactics directed toward CEI. *N.L.R.B. v. Enterprise Ass'n of Steam Pipefitters, Local 638,* 429 U.S. 507, 530 n. 17, 97 S.Ct. 891, 904 n. 17, 51 L.Ed.2d 1 (1977).

Separating secondary and primary activity appears straightforward, but may become rather complex when the primary and secondary employer occupy the same work site. In this "common situs" situation, if the union's activity has substantial and foreseeable effects upon the secondary employer, the activity will be held unlawful if it is established that the union "*intended* to cause disruption of the secondary employer's business." *Mautz & Oren,* 882 F.2d at 1121 (emphasis in original).

To evaluate claims of illegal secondary activity, federal courts have adopted an evidentiary framework established by the N.L.R.B.

in *Sailors' Union of the Pacific (Moore Dry Dock),* 92 N.L.R.B. 547, 549 (1950). Under the *Moore Dry Dock* standards, a union's picketing is presumed lawful if:

(a) The picketing is strictly limited to times when the situs of the dispute is located on the secondary employer's premises;

(b) At the time of the picketing the primary employer is engaged in its normal business at the situs;

(c) The picketing is limited to places reasonably close to the location of the situs; and

(d) The picketing discloses clearly that the dispute is with the primary employer.

*Mautz and Oren,* 882 F.2d at 1121; *Moore Dry Dock,* 92 N.L.R.B. at 549. Compliance with or violation of the *Moore Dry Dock* standards may create a presumption, but the standards are not dispositive, and the union's activity must be assessed under the totality of circumstances. *Mautz & Oren,* 882 F.2d at 1121.

Director Pascarell argues that the Union's picketing creates a presumption of illegality under the *Moore Dry Dock* standards, and is in fact illegal given the totality of circumstances. He offers the following evidence. Oscar Pedraza, security guard at the CEI facility has testified that (1) since its inception, the Union's picketing has occurred seven days a week, beginning each day at 6:00 a.m. and ending each day at 9:00 p.m. (Pedraza Affidavit ¶ 2). The picketers carry signs identifying Houbigant as the primary employer and march in front of all gates, including Gate A, which, as of January 1, 1994, has been reserved exclusively for the use of CEI employees, suppliers and guests. (*Id.;* Catanzaro Affidavit ¶¶ 6-7).

On March 14, 1994, Pedraza heard the Union's Secretary/Treasurer, Ben Camadeco, address the picketers and exclaim that (1) they were striking CEI because it was manufacturing Houbigant products, (2) they might need to use violence to reach their goals, and (3) Houbigant must "do the right thing" in order for the picketers to leave CEI and Houbigant alone. (Pedraza Affidavit ¶¶ 3-5).

On another occasion, in April 1994, Armin Seifarth, another security guard, witnessed the Union's picketers physically block Gate A

to prevent a truck driver from entering the CEI facility. Seifarth reviewed the invoice, which evidenced the delivery was for CEI. He then presented the invoice to the picket line leader who responded by stating, "I haven't learned how to read yet." (Seifarth Affidavit ¶¶ 1–3).

■ The facts as presented by Director Pascarell evidence an unlawful objective against a secondary employer, CEI. Houbigant employees are on site at the CEI facility Monday through Friday, from 9:00 a.m. until 5:00 p.m. The Union's picketing extends beyond these hours during weekdays and continues during the weekend—times when Houbigant employees are not engaged in work at the CEI facility. The picketing clearly identifies Houbigant as the employer with whom the Union has a dispute (Camadeco Affidavit ¶ 4; Pedraza Affidavit ¶ 2), yet the evidence—Camadeco's statements and the location of the picketing at Gate A— suggests that the Union also has an objective of bringing pressure to bear on CEI.

■ As for the picketing at Gate A, when a neutral employer establishes and maintains a valid reserve gate system and a union continues to picket the gate reserved for the neutral employer, the picketing is not reasonably close to the situs of the dispute with the primary employer and thus violates the third *Moore Dry Dock* standard. *Mautz & Oren*, 882 F.2d at 1122. However, if the neutral gate becomes tainted via any improper use by the primary employer and its suppliers, the union may picket every entrance at the site. *Id.* at 1122 & nn. 3–5. The Union argues that Gate A is tainted, in that CEI uses the gate to receive incoming raw materials for the manufacture of Houbi-

gant products and then to distribute the outgoing finished product.

The tainted gate issue goes to the heart of the pending complaint before the NLRB. On a section 10(*l*) application, this Court cannot render a decision on the merits, but may only grant to Director Pascarell the requested relief if he has presented facts which would fit the legal theory on which an unfair labor practice charge could be founded. Under its limited purview, and based upon the facts presented, the Court is satisfied that the Union should not be allowed to picket Gate A pending final disposition of the administrative action.

■ As far as this Court can determine, Houbigant has contracted out to CEI its manufacturing and distribution operations. All that remains of Houbigant is its sales and marketing areas, which happen to work from the CEI facility. If Houbigant's offices were not located at the CEI facility, the Union would not be allowed to picket Gate A or any other entrance to the CEI facility based upon the delivery of the raw materials or the distribution of the finished product. In the Court's view, the equation should not change just because Houbigant's sales and marketing forces are located at the CEI facility, especially when a reserved gate system has been established so that the Union may picket the Houbigant-designated Gates B and C without affecting CEI's business.[1]

### 3. Just and Proper

In determining whether injunctive relief is just and proper, a district court should focus on the main objectives of the NLRA. *Hoeber*, 939 F.2d at 126; *Kobell v. Suburban Lines*, 731 F.2d at 1090. The Third Circuit

---

1. The Union alleges that certain raw materials have been delivered through Gate A despite being invoiced directly to Houbigant. Director Pascarell has argued that all deliveries through Gate A are to supply CEI's manufacturing operations and none of these deliveries are directed to Houbigant employees for subsequent delivery to CEI. Generally, an invoice would bear Houbigant's name so that CEI could identify for which cosmetic company the materials should be earmarked. CEI provides similar manufacturing services to other cosmetic companies.

Based on the facts presented and alleged, the Court will not deny Director Pascarell's request based upon the theory that Gate A is tainted. *See*

*Mautz & Oren*, 882 F.2d at 1122 ("even in the face of *admitted breaches* of the reserved gate system, the NLRB will often find that a union has violated section 8(b)(4) by picketing a neutral gate") (emphasis in original). Given this standard, the Court finds that the Union might not ultimately establish a breach of Gate A or, alternatively, show that such a breach would vitiate any otherwise unlawful picketing in front of Gate A. The Union has provided little factual evidence to rebut Director Pascarell's evidence in view of the light burden of proof which favors the issuance of temporary injunctions in these circumstances.

has identified two objectives: (1) eliminate impediments to free flowing commerce and encourage collective bargaining, and (2) avoid disruptions that pose a danger of harm to the public.

■ The Court finds that the public interest and the objectives of the NLRA would best be served by granting to Director Pascarell certain of the requested relief. Limiting picketing to Gates B and C of the CEI facility would "acceptably balance the right of [CEI], as a neutral part[y], to avoid being enmeshed in the dispute [against] the countervailing right of the [Union] to engage in lawful picketing [of Houbigant]." *Hirsch v. System Council U–2*, 541 F.Supp. 224, 229 (D.N.J.1982). The Union appears to be engaging in activity that would disrupt the free flow of commerce and CEI's business. Whether it is entitled to engage in such conduct is a matter to be determined ultimately through the pending administrative complaint. On this section 10(*l*) application, the Court finds that a grant of temporary injunctive relief is just and proper pending a determination on the merits at the administrative level.